WAYNE COUNTY EMPLOYEES RETIREMENT SYSTEM v
WAYNE COUNTY

Docket No. 308096. Submitted March 12, 2013, at Detroit. Decided May 9,
2013, at 9:00 a.m. Leave to appeal sought.

The Wayne County Employees Retirement System and the Wayne
County Retirement Commission brought an action in the Wayne
Circuit Court against Wayne Charter County and the Wayne
County Board of Commissioners, alleging that a county ordinance
defendants enacted in 2010 concerning the retirement system,
Wayne County Enrolled Ordinance No. 2010-514, violated Const
1963, art 9, § 24 and the Public Employee Retirement System
Investment Act (PERSIA), MCL 38.1132 *et seq*. The ordinance
placed a $12 million limit on the balance of the retirement
system's reserve for inflation equity known as the Inflation Equity
Fund (IEF), which was funded by investment earnings on pension
assets. The ordinance also placed a $5 million limit on a discre-
tionary distribution of money from the IEF known as the "13th
check," which had been made annually in varying amounts to
eligible retirees and survivor beneficiaries to help fight the effects
of inflation since the IEF was created in the mid-1980s. The
ordinance required any amount in the IEF exceeding the $12
million dollar cap to be debited from the IEF and credited to the
assets of the defined benefit plan, where it would be used to offset
or reduce the annual required contribution (ARC) that the county
was required to make to the defined benefit plan pursuant to
Const 1963, art 9, § 24. The ordinance also imposed amortization
periods and caps to be used in calculating the ARC. The county
filed a counterclaim alleging, among other things, that the retire-
ment commission had violated its fiduciary duties by mismanaging
the retirement system's assets. The court, Michael F. Sapala, J.,
granted defendants' motion for summary disposition regarding
plaintiffs' constitutional and statutory objections to the ordinance,
and plaintiffs appealed as of right. The court granted summary
disposition in favor of plaintiffs on the fiduciary-duty count of the
county's counterclaim, and the county cross-appealed.

The Court of Appeals *held*:

1. The 2010 amendment of section 141 of the Wayne County Code of Ordinances (WCCO) that authorized the county to use IEF assets to offset its ARC violated the applicable version of MCL 38.1133(6), which provided that the retirement system must be a separate and distinct trust fund whose assets are for the exclusive benefit of the participants and their beneficiaries, because it allowed the county to benefit from the use of retirement system assets. The offset provision also violated the applicable version of MCL 38.1133(6)(c), which prohibited the retirement commission, as an investment fiduciary, from causing the system to engage in a transaction if it knew or should have known that the transaction would directly or indirectly allow assets of the retirement system to be used by or for the benefit of the county for less than adequate consideration. The criteria for making 13th-check distributions set forth in WCCO, § 141-32(c) and (d), were not affected by the holdings, but the issue regarding WCCO, § 141-32(f), which concerned the possibility of reimbursement of the $32 million, was rendered moot. WCCO, § 141-32(e), a surplus provision that allowed for an offset when a defined benefit plan was overfunded, was invalid under MCL 38.1140m, which sets forth the retirement commission's authority to determine an ARC through an actuary, but only to the extent that it made the exercise of an offset a decision for the county and not the retirement commission. The remaining language in WCCO, 141-32(e), was legally sound.

2. The portions of WCCO, § 141-32 that imposed a $12 million balance cap on the IEF and a $5 million cap on the distribution of IEF assets were valid only to the extent they applied prospectively, not to the $44 million that was in the IEF when the 2010 ordinance was enacted. The $32 million that exceeded the cap was required to be returned to the IEF for 13th-check distributions and could not be used to satisfy the county's ARC obligations. Prospective application of the caps would not impair or diminish accrued financial benefits in violation of Const 1963, art 9, § 24 because individual retirees and survivor beneficiaries were not legally or contractually entitled to a 13th check. Because the caps concerned structural aspects of the retirement plan that were legislative in nature, their enactment was within the purview of the county board under MCL 46.12a and did not intrude on any of the powers assigned solely to the retirement commission under PERSIA.

3. The board acted outside its authority by amending WCCO, § 141-36, to prescribe the actuarial formula, amortization periods, and actuarial methods used to determine the ARC. The 35-year cap on the amortization period set forth in WCCO,

§ 141-36(a)(1)(A), directly conflicted with MCL 38.1140m, which prohibits determining the required employer contribution by using an amortization period greater than 30 years. The remaining amortization caps added to WCCO, § 141-36, as well as the prescription in WCCO, § 141-36(a)(2), of the actuarial cost method to be employed in calculating the ARC, conflicted with the retirement commission's sole discretion to calculate the ARC through employment of an actuary and consideration of actuarial standards of practice. Therefore, these provisions were invalid.

4. The trial court did not err by granting summary disposition of the claims that the retirement commission had breached its fiduciary duties under MCL 38.1133(3) or WCCO, § 141-35(h). The retirement commission did not have a fiduciary duty to allocate investment losses to the IEF because the IEF ordinance was silent in this regard except in the sense that if there were investment losses, no funds could be allocated to the IEF for the given year. The retirement commission did not breach its fiduciary duties by setting the IEF investment return threshold rate unacceptably low or by crediting the full amount of any excess investment earnings, rather than only a portion of the excess, to the IEF. Given that for six of the eight years at issue the IEF received no funding at all, allowing some funds to reach the IEF in 2006 and 2007 was not financially imprudent, particularly when the amounts the IEF received would have resulted in only a minuscule change in the underfunded status of the defined benefit plans. The county lacked standing to claim that the retirement commission breached its fiduciary duties by issuing 13th checks from the IEF because, given that the amount of any decrease in total disbursements would not have flowed back to the defined benefit plans, the county suffered no special injury and had no substantial interest at stake. For the same reason, the county had no standing to argue that the retirement commission breached its fiduciary duties by making 13th-check distributions to ineligible recipients. Regardless, a review of the total annual 13th-check distributions shows that, as a matter of law, the county acted prudently and exercised reasonable care in maintaining the fiscal soundness of the IEF. The retirement commission also did not breach its fiduciary duties by failing to maintain and implement written policies related to the management of the IEF pursuant to MCL 38.1133(3)(f). Assuming the county had standing to make this argument, the matters the county identified were discretionary and did not lend themselves to or require written policies under PERSIA.

5. The retirement commission did not violate Const 1963, art 9, § 24 by diminishing or impairing accrued financial benefits

through the mismanagement of the retirement system's assets. To the extent that this claim was predicated on the same acts or omissions that constituted the claims for breach of fiduciary duty, the county did not have standing to bring it. In regard to the remaining arguments, there was no actual diminishment or impairment of defined benefit assets because the retirement system, acting under a construct created by the county board in the IEF ordinance, merely allowed certain investment earnings to flow into the IEF instead of cutting the flow and permitting those earnings to be stockpiled with existing defined benefit plan assets.

6. Defendants' argument that the trial court should have ordered plaintiffs to pay their attorney fees and costs with IEF assets as opposed to defined benefit plan assets was factually and legally undeveloped and therefore was not addressed.

Affirmed in part and reversed in part.

*Racine & Associates* (*Marie T. Racine* and *Jennifer A. Cupples*) and *Jaffee, Raitt, Heuer & Weiss, PC* (by *Brian G. Shannon*), for the Wayne County Employees Retirement System and the Wayne County Retirement Commission.

*Dickinson Wright PLLC* (by *Francis R. Ortiz, Phillip J. DeRosier, Scott A. Petz,* and *Jeffrey E. Ammons*) for Wayne Charter County.

Amicus Curiae:

*VanOverbeke, Michaud & Timmony, P.C.* (by *Francis E. Judd* and *Michael J. VanOverbeke*), for the Michigan Association of Public Employee Retirement Systems.

Before: MURPHY, C.J., and O'CONNELL and BECKERING, JJ.

MURPHY, C.J. This case concerns retirement system assets, formulas, allocations, and funding, and it involves a constitutional and statutory challenge by plaintiffs Wayne County Employees Retirement System (the Retirement System) and Wayne County Retirement

Commission (the Retirement Commission) in regard to a county ordinance enacted in 2010 by defendant Charter County of Wayne (the County) through a vote of defendant Wayne County Board of Commissioners (the County Board). Plaintiffs argue that the ordinance violates Const 1963, art 9, § 24, and the Public Employee Retirement System Investment Act (PERSIA), MCL 38.1132 *et seq*. The trial court granted defendants' motion for summary disposition, rejecting plaintiffs' constitutional and statutory objections to the ordinance. Plaintiffs appeal this ruling as of right. We hold that, while some of the language is safe from challenge, multiple provisions of the ordinance violate PERSIA, most importantly a provision requiring an offset of certain inflation reserve assets against the County's annual contribution to the pension fund. The offset provision improperly authorized the County to take excess Retirement System inflation reserve assets and use them for the County's benefit. The benefit of the offset to the County was that it greatly reduced the amount of money needed to be paid from the County's own coffers to satisfy constitutionally mandated pension funding obligations. We find it unnecessary, for the most part, to analyze this case under Const 1963, art 9, § 24. Furthermore, the trial court granted summary disposition in favor of plaintiffs relative to count III of the County's counterclaim, which alleged that the Retirement Commission mismanaged the assets of the Retirement System, violating certain fiduciary duties. The County has cross-appealed that ruling. We hold that the trial court did not err in summarily dismissing the fiduciary-duty claims, given that the County lacked standing to raise such claims and/or failed to establish the existence of a genuine issue of material fact with respect to the claims. We also reject a couple of additional cursory arguments posed by the County regard-

ing attorney fees and costs and Const 1963, art 9, § 24, which the trial court did not address. In sum, we affirm in part and reverse in part.

## I. OVERVIEW

The ordinance at issue placed a $12 million limit on the balance of a reserve for inflation equity, referred to as the Inflation Equity Fund (IEF), which previously had no particular dollar cap, and which is funded by investment earnings, exceeding a certain threshold rate of return, on pension assets pursuant to an actuarially based formula. The ordinance additionally placed a $5 million limit on the distribution of monies from the IEF to eligible retirees and survivor beneficiaries, commonly referred to as the "13th check" distribution, which also had no prior dollar cap, and which, although discretionary, had been made annually in varying amounts without fail since the inception of the IEF in the mid-1980s. Twelve regular monthly pension distributions, paid from assets of the defined benefit plan—which include contributions by the County and its employees, and the investment earnings thereon—are enjoyed by those eligible as an accrued financial benefit on the basis of service rendered.[1] The purpose or intent behind creating and funding the IEF was to provide extra cash to assist retirees and survivor beneficiaries in fighting the effects of inflation. The use of regular cost-of-living allowances (COLAs) predated the creation of the IEF and the payment of 13th checks.

The challenged ordinance further required that the amount in the IEF in excess of the $12 million dollar cap, which excess was approximately $32 million given

---

[1] The County's defined contribution plan is not implicated in this case. The County oversees multiple defined benefit and hybrid plans.

that the IEF's balance had grown to around $44 million at the time of the ordinance's enactment, be debited from the IEF and credited to the defined benefit plan assets. In turn, the ordinance mandated use of the excess, the $32 million, to offset or reduce the County's defined benefit annual required contribution (ARC), with the credited amount thereafter being deemed part of the defined benefit plan assets. IEF and defined benefit plan assets are all held together in trust, but accounting records provide for a distinct allocation or crediting of the assets.[2] The Retirement Commission is responsible for determining the County's ARC for purposes of defined benefit funding, and the Retirement Commission employs an actuary to make the necessary actuarial calculations and develop ARC numbers. Assets in the IEF are not taken into consideration in fixing the amount of the ARC. The ordinance effectively allowed defendants to satisfy ARC obligations through an accounting transaction that substantially depleted assets that had accumulated in the IEF and were chiefly designated for 13th checks, shifting and adding the "excess" IEF assets to the defined benefit plan assets as opposed to attaining ARC compliance by adding to the defined benefit plan assets through a direct contribution from County coffers. Finally, the ordinance addi-

---

[2] Plaintiffs often note that IEF assets *are* defined benefit plan assets, considering that a person covered by a defined benefit plan enjoys a right to standard, mandatory pension payments (12 monthly pension checks) and to participate in the IEF program (13th check). However, there is no dispute that accounting records allocate a particular amount to the IEF out of the overall trust fund total. For purposes of this opinion and ease of reference, when we speak of "IEF assets," it will pertain to asset amounts designated for distribution through the IEF program with the understanding that the program falls under the benefit umbrella of the defined benefit plan packages, and when we speak of "defined benefit plan assets," it will pertain to asset amounts designated for regular pension payments and not allocated or credited to the IEF in accounting records.

tionally imposed particular amortization periods and caps to be used in calculating the ARC.

The Michigan Constitution provides in relevant part:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.
>
> Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities. [Const 1963, art 9, § 24.]

Plaintiffs argued that the ordinance violated both clauses of Const 1963, art 9, § 24, by diminishing or impairing accrued financial benefits, and by effectively abrogating the County's annual funding obligation or ARC. The trial court disagreed, ruling on cross-motions for summary disposition that "the IEF is not an accrued financial benefit" and that payment of the 13th check is entirely discretionary, not mandatory, under the ordinance and applicable collective bargaining agreements (CBAs).

Plaintiffs also contended that the ordinance violated various provisions of PERSIA by taking a credit against the Retirement System's trust assets for the County's benefit during a period of underfunding, by overriding the Retirement Commission's discretion in taking such a credit, by treating trust assets as assets of the County, and by the imposition of amortization periods and caps in derogation of the Retirement Commission's discretion. The trial court again disagreed, ruling on cross-motions for summary disposition that § 20m of PERSIA, MCL 38.1140m, "does not address or prohibit the transfer of funds from the IEF . . . to meet the County's [ARC] [o]bligation." With respect to additional PERSIA provisions relied on by plaintiffs in support of their

arguments, the trial court rejected them for the many reasons set forth in defendants' summary disposition brief. Plaintiffs appeal the rulings on their constitutional and statutory challenges as of right.

The County cross-appeals the trial court's ruling granting summary disposition in favor of plaintiffs with respect to count III of the County's counterclaim, which sought declaratory and injunctive relief on the basis that the Retirement Commission violated various fiduciary duties in managing the assets of the Retirement System. The County alleged a number of improprieties by the Retirement Commission in count III, including allocating investment losses to defined benefit plan assets but not to the IEF, electing to make 13th-check distributions when defined benefit plans were underfunded, directing the Retirement System's assets to the IEF and away from the defined benefit plan assets despite the fact that the plans were underfunded, making 13th-check payments to all members of the various retirement plans despite the ineligibility of members who participated solely in the defined contribution plan, failing to establish written policies and objectives for determining when IEF distributions should be made, and in bringing an untenable lawsuit. On cross-motions for summary disposition, the trial court granted summary disposition in favor of plaintiffs, ruling that plaintiffs had submitted evidence showing compliance with the Retirement Commission's fiduciary duties and other legal obligations and that the County had failed to present evidence sufficient to create a genuine issue of material fact on its claims, thereby entitling plaintiffs to judgment as a matter of law.[3]

---

[3] The County's counterclaim contained three counts, with the first count simply requesting a declaration that the ordinance was lawful and enforceable, which issue was subsumed in the ruling that rejected plaintiffs' constitutional and statutory challenges, and the second count seeking a declaration that parts of the ordinance remained legally sound

II. BACKGROUND

A. UNDERLYING COUNTY AUTHORITY: MICHIGAN CONSTITUTION,
CHARTER COUNTIES ACT, AND WAYNE COUNTY CHARTER

Under the authority of Const 1963, art 7, § 2, "[a]ny county may . . . adopt . . . a county charter in a manner and with powers and limitations to be provided by general law . . . ." Pursuant to 1966 PA 293, the Legislature enacted the charter counties act (CCA), MCL 45.501 *et seq.* "Every county adopting a charter under the provisions of . . . [the CCA] shall be a body corporate." MCL 45.501. "Wayne County adopted a home-rule charter which took effect on January 1, 1983, establishing a county government with a chief executive officer in accordance with the [CCA.]" *Lucas v Wayne Co Election Comm*, 146 Mich App 742, 744; 381 NW2d 806 (1985); see also Home Rule Charter for the County of Wayne.[4]

The CCA contains certain mandates for county charters adopted under the act. Specifically, under MCL 45.514(1)(e), a charter must provide for "[t]he continuation and implementation of a system of pensions and retirement for county officers and employees in those counties having a system in effect at the time of the adoption of the charter."[5] MCL 45.514(1)(e) further provides that a system provided under a charter "shall recognize the accrued rights and benefits of the officers

and viable assuming the court were to agree with certain objections to the ordinance. Summary dismissal of count III, therefore, closed the case in its entirety.

[4] Wayne County Charter, § 1.112, states in part that the County, "a body corporate, possesses home rule power enabling it to provide for any matter of County concern and all powers conferred by constitution or law upon charter counties or upon general law counties, their officers, or agencies."

[5] There is no dispute that Wayne County had a system of pensions and retirement for county officers and employees in place at the time the charter was adopted.

and employees under the system then in effect," "shall not infringe upon nor be in derogation of those accrued rights and benefits," and "shall not preclude future modification of the system."

Article VI of the Wayne County Charter addresses the subject of retirement and, consistently with the requirements of MCL 45.514(1)(e), § 6.111 provides:

> The Wayne County Employees Retirement System created by ordinance is continued for the purpose of providing retirement income to eligible employees and survivor benefits. The County Commission may amend the ordinance, but an amendment shall not impair the accrued rights or benefits of any employee, retired employee, or survivor beneficiary.

See also *Wayne Co v Wayne Co Retirement Comm*, 267 Mich App 230, 234; 704 NW2d 117 (2005). Wayne County Charter, § 6.112, provides that the Retirement Commission is composed of eight members, including "[t]he [chief executive officer (CEO)] or the designee of the CEO, the chairperson of the County Commission, and 6 elected members," four of whom must be active employees and two of whom must be retired employees. "The Retirement Commission shall administer and manage the Retirement System," and "[t]he costs of administration and management of the Retirement System shall be paid from the investment earnings of the Retirement System." *Id*. "The financial objective of the Retirement System is to establish and receive contributions each fiscal year which, as a percentage of active member payroll, are designed to remain approximately level from year to year." *Id*. at § 6.113. Wayne County Charter, § 6.113, further provides that "contributions shall be sufficient to (i) cover fully costs allocated to the current year by the actuarial funding method, and (ii) liquidate over a period of years the unfunded costs allocated to prior years by the actuarial funding method."

B. COUNTY ORDINANCE SCHEME REGARDING
RETIREMENT—IN GENERAL

Chapter 141 of the Wayne County Code of Ordinances (WCCO) governs the subject of retirement. WCCO, § 141-1, provides that "[t]he county employees' retirement system established effective December 1, 1944, is hereby continued and restated under authority of the Home Rule Charter for the county and . . . MCL 46.12a[.]"[6] With respect to the interplay between the WCCO and CBAs, WCCO, § 141-2, provides that "[a] conflict between the provisions of the retirement chapter and the provisions of a collective bargaining agreement shall be resolved, to the extent of the conflict, in accordance with the collective bargaining agreement." The WCCO currently refers to and delineates the rules concerning multiple defined benefit plans, one defined contribution plan, and a hybrid plan. WCCO, §§ 141-10, 141-20 to 141-22.1.[7]

WCCO, § 141-35, addresses various aspects of the Retirement Commission, and in regard to the Retirement Commission's investment authority, subsection (h) provides:

> The retirement commission is the trustee of the assets of the retirement system. The retirement commission has the authority to invest and reinvest the assets of the retirement

---

[6] MCL 46.12a addresses the authority of a county board of commissioners with respect to insurance, retirement, and pension benefits for county employees.

[7] In general terms, a "defined benefit plan" is a "plan established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to employees over a period of years, usu. for life, after retirement," that "are measured by and based on various factors such as years of service rendered and compensation earned." Black's Law Dictionary (7th ed), p 543 (under "employee benefit plan"). A "defined contribution plan" is "an employee retirement plan in which each employee has a separate account — funded by the employee's contributions and the employer's contributions (usu. in a preset amount), the employee being entitled to receive the benefit generated by the individual account." Id.

system subject to all terms, conditions, limitations and restrictions imposed by the state on the investments of public employee retirement systems. The retirement commission may employ investment counsel to advise the board in the making and disposition of investments. In exercising its discretionary authority with respect to the management of the assets of the retirement system, the retirement commission shall exercise the care, skill, prudence, and diligence, under the circumstances then prevailing, that an individual of prudence acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and similar objectives.

With respect to parameters governing the Retirement Commission's handling of assets, WCCO, § 141-35(i)(1), provides that "[t]he assets of the retirement system shall be held and invested for the sole purpose of meeting the obligations of the retirement system and shall be used for no other purpose."

WCCO, § 141-37, addresses "reserve accounting" with respect to reserves for accumulated member contributions, for member accounts, for pension payments, for defined benefit employer contributions, for defined contribution employer contributions, and for undistributed investment income and administrative expenses. WCCO, § 141-37(a) through (f). WCCO, § 141-37(g), provides that "[t]he descriptions of the reserve accounts shall be interpreted to refer to the accounting records of the retirement system and not to the segregation of assets by reserve account," although "[t]he retirement commission may segregate assets attributable to defined contribution benefits." We note that the IEF is not identified as a reserve covered by WCCO, § 141-37.

### C. HISTORY OF INFLATION EQUITY PROGRAM AND THE 2010 ORDINANCE

There is no dispute that, before the creation of the IEF, the County used COLAs at times to address the

effects of inflation on the buying power of pension income. Wayne County Enrolled Ordinance No. 86-284, adopted and made effective July 24, 1986, provided for and recognized the establishment of the IEF as of November 30, 1985, and set forth the formula by which to calculate the amount required to be credited or allocated to the IEF at the end of a fiscal year[8] predicated on investment earnings above a threshold rate of return. The 1986 enrolled ordinance further stated that "the board of trustees may, not more frequently than once a year, distribute to retired members and survivor beneficiaries a percentage of the balance in the [IEF]," and it indicated that the "percentage shall be selected by the board of trustees but shall not be less than twenty percent nor more than fifty percent."[9]

In relationship to the pertinent language in the 1986 enrolled ordinance, Wayne County Enrolled Ordinance No. 94-747, adopted and made effective November 17, 1994, replaced the term "board of trustees" with "retirement commission," but was otherwise substantively unchanged from the 1986 version, including the language that made the IEF distribution discretionary.[10]

---

[8] The fiscal year for the County runs from October 1 to September 30. When we refer to a particular year in this opinion, it relates to the County's fiscal year unless otherwise indicated.

[9] We note that the "enrolled ordinances" discussed here generally encompassed more than one WCCO section in the retirement chapter and dealt with a variety of matters. Our attention is focused on that language in the enrolled ordinances that is pertinent to the issues on appeal and that ultimately has a connection to WCCO, §§ 141-32 and 141-36, and the amendment of those sections in 2010 by the ordinance at issue. The amendment of these two sections, which are addressed with particularity below, forms the basis of plaintiffs' lawsuit.

[10] With respect to calculating the amount required to be credited to the IEF, the 1994 enrolled ordinance, using language comparable to the 1986 enrolled ordinance, provided:

In relationship to the relevant language in the 1994 enrolled ordinance, Wayne County Enrolled Ordinance No. 2000-536, adopted and made effective September 7, 2000, contained some substantive changes. First, with respect to the calculation regarding the amount to be credited annually to the IEF, the 2000 enrolled ordinance spoke of "a portion of the excess . . . of the rate of return" instead of just "[t]he excess . . . of the rate of return," leaving it to the Retirement Commission to "establish the portion of the excess rate of return used in [the] calculation."[11] Further, while a distribution

---

The retirement commission shall credit the reserve with the following amount at the end of each fiscal year:

The excess, if any, of the rate of return on the actuarial value of retirement system defined benefit assets over the rate established for this purpose by the retirement commission, multiplied by the actuarial present value of pensions being [paid to] retired members and survivor allowance beneficiaries, both as reported in the annual actuarial valuation.

Here is an example of the formula at work for the years 1998 and 2008. The actuarial present value of the pensions was $611,233,276 in 1998. The actual rate of investment return on the actuarial value of retirement system defined benefit assets was 10.09 percent. The threshold rate of investment return set by the Retirement Commission was 8 percent. The excess rate of return was therefore 2.09 percent, which is multiplied by the actuarial present value of the pensions ($611,233,276). The product is $12,774,775, which was the amount credited to the IEF in 1998. The actuarial present value of the pensions was $883,852,759 in 2008. The actual rate of investment return on the actuarial value of retirement system defined benefit assets was 5.51 percent. The threshold rate of investment return set by the Retirement Commission was 9 percent. Because there was no excess rate of return, zero percent is multiplied by the $883,852,759, resulting, of course, in a product of zero. Accordingly, no money was credited to the IEF in 2008, although $9.2 million in 13th checks was paid out that year from an IEF existing balance of $65.7 million.

[11] With respect to the remainder of the formula, the 2000 enrolled ordinance was identical to the 1986 and 1994 enrolled ordinances. See footnote 10 of this opinion. Therefore, with the 2000 enrolled ordinance,

from the IEF remained discretionary on the Retirement Commission's part ("may . . . distribute"), the percentage of the balance in the IEF subject to potential distribution was no longer restricted to the 20 to 50 percent range. Rather, the percentage of the IEF balance that could be distributed was now left entirely up to the Retirement Commission without the range limitation. The amendments in 2000 essentially increased the Retirement Commission's discretionary authority relative to the IEF.

In the various versions of the IEF ordinance discussed earlier, while there was a formula used to calculate the amount to credit to the IEF in a fiscal year, no particular dollar limitations on the IEF's balance were ever set forth. Additionally, in the various versions of the IEF ordinance, while initially employing a 20 to 50 percent range in determining the percentage of the IEF subject to possible distribution before subsequently leaving it entirely up to the Retirement Commission's discretion, there were no particular dollar limitations on a distribution in a given year. This all changed with Wayne County Enrolled Ordinance No. 2010-514, adopted and made effective September 30, 2010, the last day before fiscal year 2011. The current version of WCCO, § 141-32, embodies changes made in the 2010 enrolled ordinance, and it provides in full as follows:

(a) The retirement commission shall maintain a reserve for inflation equity [IEF] *provided that the fund shall be limited to no more than $12,000,000.*

(b) (1) *Subject to the limit of (a) above,* the Retirement Commission may credit the reserve at the end of each fiscal

---

the Retirement Commission's decisions that directly affected the flow of funds into the IEF included establishing the threshold return rate, as previously was the case, and now also determining how much of the investment earnings in excess of the threshold rate of return should go to the IEF.

year with a portion of the excess, if any, of the rate of return on the actuarial value of retirement system defined benefit assets over the rate established for this purpose by the Retirement Commission.

(2) The Retirement Commission shall establish the portion of the reserve fund available for distribution to retired members and survivor beneficiaries; *provided that portion shall not exceed $5,000,000.*

(3) *The calculation of "defined benefit assets" shall exclude the County's retirement contribution for that fiscal year as set forth in Sec. 141.36 provided the amount in the reserve fund in excess of the limit set forth in (a) above shall be debited from the reserve fund and credited to the Defined Benefit Plan assets and such credit shall offset and/or reduce the County's defined benefit contribution requirement and thereafter be considered Defined Benefit Plan assets.*

(c) The Retirement Commission may restrict the distribution and/or the minimum permanent pension to retired members and survivor beneficiaries having a pension effective date prior to dates selected from time to time by the Retirement Commission.

(d) The formula for the distribution shall be as from time to time determined by the Retirement Commission and shall take into account the period of retirement and period of credited service.

(e) Nothing in this section shall preclude *the County* from reducing or eliminating its contribution for a fiscal year in which defined benefit assets exceed defined benefit liabilities.

(f) Within 9 months of first annual distribution from this fund, the [chief financial officer] shall explore and report to the Wayne County Commission whether it is advantageous to issue bonds as a strategy to fully fund the retirement system and *reimburse the Inflation Equity fund of $32 million dollars.* [Emphasis added.][12]

---

[12] We note that with respect to WCCO, § 141-32(c) and (d), the language in these provisions had been part of the IEF ordinance from the very start

As reflected above, WCCO, § 141-32(b)(3), refers to WCCO, § 141-36, which, as with WCCO, § 141-32, was also modified by Wayne County Enrolled Ordinance No. 2010-514. WCCO, § 141-36, which addresses the County's ARC, provides in part that the "[c]ontribution requirements for defined benefits shall be determined by annual actuarial valuation; provided that the contribution requirement may be reduced or eliminated for a fiscal year pursuant to the procedures in section 141-32." WCCO, § 141-36(a)(2). Accordingly, Wayne County Enrolled Ordinance No. 2010-514, as codified in WCCO, §§ 141-32 and 141-36, effectively granted defendants the authority to take the excess between the newly imposed $12 million IEF limit and the preexisting $44 million in the IEF,[13] and use that $32 million excess as a credit against the County's ARC obligation. Of additional relevance, Wayne County Enrolled Ordinance No. 2010-514 also modified the language in WCCO, § 141-36, by imposing certain amortization caps with respect to the formula for determining the ARC. We shall discuss the details of that change in part II(D) of this opinion, which focuses on the ARC.

Records of the Retirement System indicated that 13th-check distributions have been made without fail since the inception of the IEF and that the amount annually disbursed fluctuated from year to year, at times decreasing from the previous year. In chronological order, from 1986 through 2009, the following amounts represent the aver-

_____

in 1986, and Wayne County Enrolled Ordinance No. 2010-514 did not result in any changes. These provisions are not at issue. Further, in regard to WCCO, § 141-32(e), the language in this provision is new, having been incorporated by the 2010 enrolled ordinance. We shall discuss this particular provision later in the opinion.

[13] The actuary's annual actuarial valuation report dated September 30, 2010, indicated that the balance in the IEF was $44,220,597 and had been $49,210,581 on the same date a year earlier.

age individual 13th checks that were distributed by the
Retirement Commission to retirees and survivor benefi-
ciaries: $677; $843; $823; $1,281; $1,842; $972; $1,361;
$1,984; $2,045; $1,440; $1,538; $1,836; $2,382; $2,355;
$2,603; $2,907; $2,938; $2,953; $2,380; $2,361; $2,030;
$1,685; $1,703; and $1,699.[14] In chronological order, from
1986 through 2009, the following amounts reflect mon-
ies credited to the IEF at the end of the fiscal year under
the investment return formula: $7.1 million; $5.9 mil-
lion; $13.1 million; $17.6 million; zero; $21.7 million;
$26 million; $9.5 million; $156,000; $16.3 million; $18.3
million; $22.3 million; $12.7 million; $45.9 million;
$41.1 million; $1.7 million; zero; zero; zero; zero; $10.6
million; $23.2 million; zero; and zero.

### D. THE ANNUAL REQUIRED CONTRIBUTION (ARC)

Pursuant to the second clause of Const 1963, art 9,
§ 24, "[f]inancial benefits arising on account of service
rendered in each fiscal year shall be funded during that
year and such funding shall not be used for financing
unfunded accrued liabilities." "[T]he purpose of the
provision was to prevent the shifting of the burden for
pensions from the taxpayers who derived benefit from
the services rendered to future taxpayers by 'back door'
spending, *i.e.*, by diverting current funding to finance
unfunded accrued liability." *Jurva v Attorney General*,
419 Mich 209, 224-225; 351 NW2d 813 (1984).[15] The

---

[14] In chronological order, from 1986 through 2009, the following
amounts are the total disbursements in the year by the Retirement
Commission in the form of 13th checks (in millions of dollars): $4; $5.1;
$5; $7.8; $11.3; $5.9; $8.4; $12.3; $12.7; $8.9; $9.5; $11.3; $14.6; $14.2;
$15.5; $17.1; $17.1; $17.1; $13.3; $13.3; $11.1; $9.2; $9.2; and $9.4.

[15] "Unfunded accrued liabilities" are the amounts needed, as estimated
according to actuarial projections, to satisfy existing pension obligations.
*Shelby Twp Police & Fire Retirement Bd v Shelby Twp*, 438 Mich 247, 256
n 4; 475 NW2d 249 (1991).

establishment and maintenance of the actuarial sound-
ness of pension systems was the delegates' overriding
concern at the Constitutional Convention. *Id.* at 225. In
regard to the annual funding requirement of Const
1963, art 9, § 24, our Supreme Court in *Shelby Twp
Police & Fire Retirement Bd v Shelby Twp*, 438 Mich
247, 255-256; 475 NW2d 249 (1991), observed:

> Our assessment of art 9, § 24 and our examination of the
> constitutional debates, reveals the framers' clear intent to
> create a contractual obligation to ensure the full payment
> of financial benefits in the pension and retirement system.
> Permitting the township to fund only pensions payable in
> that year to current retirees and beneficiaries would un-
> justly alleviate the township of its obligation to fully fund
> the pension system.

> We therefore find that the second paragraph of art 9,
> § 24 expressly mandates townships and municipalities to
> fund all public employee pension systems to a level which
> includes unfunded accrued liabilities.

Section 20m of PERSIA, MCL 38.1140m,[16] addresses
the Retirement Commission's governance over ARC
formulas and determinations, actuary participation,
and other ARC-related matters, stating in part:

> The governing board vested with the general adminis-
> tration, management, and operation of a system or other
> decision-making body that is responsible for implementa-
> tion and supervision of any system [here, the Retirement
> Commission] shall confirm in the annual actuarial valua-
> tion and the summary annual report required under sec-
> tion 20h(2)[, MCL 38.1140h(2)] that each plan under this
> act provides for the payment of the required employer
> contribution as provided in this section and shall confirm
> in the summary annual report that the system has received

---

[16] MCL 38.1140m was recently amended pursuant to 2012 PA 347,
effective March 28, 2013. We are quoting the previous version of MCL
38.1140m, which governs in this case.

the required employer contribution for the year covered in the summary annual report. The required employer contribution is the actuarially determined contribution amount. . . . The governing board vested with the general administration, management, and operation of a system or other decision-making body of a system shall act upon the recommendation of an actuary and the board and the actuary shall take into account the standards of practice of the actuarial standards board of the American academy of actuaries in making the determination of the required employer contribution.

"[T]he statutory language is unequivocal that the Board [here, the Retirement Commission] determines the amount the employer . . . contributes annually to the retirement system and that the employer, in turn, is 'required' to make the contribution." *Bd of Trustees of the Policemen & Firemen Retirement Sys of Detroit v Detroit*, 270 Mich App 74, 80-81; 714 NW2d 658 (2006). It is the Retirement Commission's responsibility to ensure that the Retirement System is adequately funded. *Id.* at 75.

Returning to our discussion of WCCO, § 141-36, which was amended by Wayne County Enrolled Ordinance No. 2010-514 relative to the ARC and amortization caps, the section previously provided in pertinent part:

a)(1) The financial objective of the retirement system is to receive contributions each fiscal year which, as a percentage of member payroll, are designed to remain level from year to year and are sufficient to:

a. Fund the actuarial cost allocated to the current year by the actuarial cost method; and

b. Fund unfunded actuarial costs allocated to prior years by [the] actuarial cost method over a period or periods of future years as determined by the retirement commission

based on consultation with the actuary and approval by resolution of the county commission.

WCCO, § 141-36, as amended by the 2010 enrolled ordinance, now provides in relevant part:

(a)(1) The financial objective of the retirement system is to receive contributions each fiscal year which, as a percentage of member payroll, are designed to remain level from year to year and are sufficient to (i) fund the actuarial cost allocated to the current year by the actuarial cost method, and (ii) fund unfunded actuarial costs to prior years by the actuarial cost method as follows:

a. Over not more than 35 years for amounts existing December 1, 1982.

b. Over not more than 25 years for amounts arising from benefit changes effective after November 30, 1982.

c. Over not more than 15 years for amounts arising from experience[d] losses or gains during retirement system fiscal years ending after November 30, 1981.

As can be gleaned from reading the two versions of WCCO, § 141-36, with the amendment, the County Board imposed specific caps on amortization periods where previously there were no identified caps and such matters were determined by the Retirement Commission on the basis of consultation with an actuary and the approval of the County Board. Both versions of WCCO, § 141-36, provided for an annual actuarial valuation for purposes of determining the ARC, but, as indicated earlier, the amended version provided for a reduction or elimination of the ARC on the basis of the IEF excess and credit to the defined benefit plan assets upon application of the $12 million IEF balance limitation under WCCO, § 141-32.

In an affidavit supplied by Judith Kermans, who was employed by the Retirement System's actuary as a senior consultant and regional director, she averred

that the County's defined benefit plans "are funded by member contributions, employer contributions[,] and investment income on Retirement System assets"; that members contribute a percentage of their pay; that Wayne County, the employer, "is charged with contributing the actuarially determined remaining amount needed to fund the Retirement System obligations to pay pension benefits currently in payment status and benefits that will be paid in the future"; that the actuary prepares the actuarial valuation for purposes of calculating the County's ARC; and that the "ARC is calculated as a percentage of member covered payroll." Kermans further averred that the "actuarial valuation is intended to produce [an ARC] which is sufficient (1) to cover the actuarial costs allocated to the current year by the actuarial cost method (the normal cost); and (2) to finance over a period of future years, the actuarial costs not covered by present assets and anticipated future normal costs (i.e. the unfunded actuarial accrued liability)." Kermans indicated that the Retirement System "has been in a negative . . . net cash flow position for several years," and as of September 30, 2010, the date of the enactment of the ordinance at issue, "the Retirement System was 60% funded, based upon the Funding Value of Assets and 51% funded, based on the Market Value of Assets." Kermans stated that, as of September 30, 2009, the ARC was calculated to be "30.26% of County covered payroll for fiscal year 2011," and that "[b]ased upon an ARC of 30.26%, the estimated required Employer dollar contribution for Fiscal Year 2011 [was] expected to be between $39 Million and $40 Million[.]" We finally note that, in her deposition, Kermans testified that the IEF is separate and "not used to calculate the ARC, it is walled off." Defendants do not dispute that characterization.

E. THE LITIGATION

Plaintiffs filed suit against defendants, arguing that WCCO, §§ 141-32 and 141-36, as amended by Wayne County Enrolled Ordinance No. 2010-514, violated various constitutional and statutory provisions, and plaintiffs sought relief in the form of mandamus, a declaratory judgment, an injunction, and attorney fees on the basis of the violations. The County filed a counterclaim, alleging, in count III, that the Retirement Commission violated its fiduciary duties in myriad ways relative to administering the IEF and making 13th-check distributions over the years. The parties filed competing motions for summary disposition with respect to plaintiffs' complaint and count III of the County's counterclaim. The trial court granted summary disposition in favor of defendants in regard to the constitutional and statutory challenges presented by plaintiffs in their complaint. The trial court granted summary disposition in favor of plaintiffs as to count III of the County's counterclaim. The parties appeal and cross-appeal the summary disposition rulings. Details with respect to the complaint, counterclaim, the cross-motions for summary disposition, the documentary evidence submitted by the parties in connection with the summary disposition motions, and the trial court's ruling will be discussed when relevant to our analysis of the issues on appeal.

III. ANALYSIS

A. STANDARDS OF REVIEW

This Court reviews de novo rulings on motions for summary disposition, issues of statutory construction, matters concerning the interpretation and application of municipal ordinances, and questions of constitutional law. *Midland Cogeneration Venture Ltd Partnership v Naf-*

*taly*, 489 Mich 83, 89; 803 NW2d 674 (2011); *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008); *Great Lakes Society v Georgetown Charter Twp*, 281 Mich App 396, 407; 761 NW2d 371 (2008). Questions of law relative to declaratory judgment actions are reviewed de novo, but the trial court's decision to grant or deny declaratory relief is reviewed for an abuse of discretion. *Guardian Environmental Servs, Inc v Bureau of Constr Codes & Fire Safety*, 279 Mich App 1, 5-6; 755 NW2d 556 (2008). The decision whether to grant injunctive relief is discretionary, although equitable issues are generally reviewed de novo, with underlying factual findings being reviewed for clear error. *Cipri v Bellingham Frozen Foods, Inc*, 235 Mich App 1, 9; 596 NW2d 620 (1999). With respect to mandamus, in *Coalition for a Safer Detroit v Detroit City Clerk*, 295 Mich App 362, 367; 820 NW2d 208 (2012), this Court stated:

> We review for an abuse of discretion a circuit court's decision on a request for mandamus. However, we review de novo the first two elements required for issuance of a writ of mandamus—that defendants have a clear legal duty to perform, and plaintiffs have a clear legal right to performance of the act requested—as questions of law. [Citations omitted.]

Finally, we review de novo the question of law whether to recognize a claim for breach of fiduciary duty. *Calhoun Co v Blue Cross Blue Shield of Mich*, 297 Mich App 1, 20; 824 NW2d 202 (2012).

### B. SUMMARY DISPOSITION—MCR 2.116(C)(10)

Although the trial court did not specify the particular subrule under MCR 2.116(C) that it was invoking when ruling on the motions for summary disposition, it is clear from the language used in its opinions and orders and its reliance on documentary evidence, going outside the confines of the pleadings, that the court was relying on

MCR 2.116(C)(10), which dictates the analysis that we will apply. *Spiek v Dep't of Transp*, 456 Mich 331, 338; 572 NW2d 201 (1998). In general, MCR 2.116(C)(10) provides for summary disposition where there is no genuine issue regarding any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994). A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996); MCR 2.116(G)(5). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). The trial court is not permitted to assess credibility, to weigh the evidence, or to resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). *Skinner*, 445 Mich at 161; *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 437; 695 NW2d 84 (2005). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999).

C. PRINCIPLES OF CONSTITUTIONAL, STATUTORY, AND ORDINANCE INTERPRETATION

With respect to the interpretation of ordinances and statutes, in *Bonner v City of Brighton*, 298 Mich App 693, 704-705; 828 NW2d 408 (2012), this Court observed:

When reviewing an ordinance, we apply the same rules applicable to the construction of statutes. "The goal of statutory construction, and thus of construction and interpretation of an ordinance, is to discern and give effect to the intent of the legislative body." The words used by the legislative body provide the most reliable evidence of its intent. Unless otherwise defined, we assign the words in a municipal ordinance their plain and ordinary meanings, avoiding an interpretation that would render any part of an ordinance surplusage or nugatory. Also, unless a different intent is manifest, the language used by the legislative body must be understood and read in its grammatical context. The legislative body is deemed to have intended the meaning clearly expressed in an ordinance's unambiguous language, which must be enforced as written. " 'A necessary corollary of these principles is that a court may read nothing into an unambiguous [ordinance] that is not within the manifest intent of the [legislative body] as derived from the words of the [ordinance] itself.' " [Citations omitted.]

In regard to construing the Michigan Constitution, "[o]ur goal . . . is to discern the original meaning attributed to the words of a constitutional provision by its ratifiers." *People v Nutt*, 469 Mich 565, 573; 677 NW2d 1 (2004). The rule of "common understanding" is applied in the analysis. *Id.* "In applying this principle of construction, the people are understood to have accepted the words employed in a constitutional provision in the sense most obvious to the common understanding and to have 'ratified the instrument in the belief that that was the sense designed to be conveyed.' " *Id.* at 573-574 (citation omitted). Debates during the Constitutional Convention, as well as the Address to the People, can serve as aids in determining the ratifiers' intent. *Id.* at 574.

#### D. DECLARATORY RELIEF, MANDAMUS, AND INJUNCTIONS

"In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights

and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted." MCR 2.605(A)(1). "An 'actual controversy' under MCR 2.605(A)(1) exists when a declaratory judgment is necessary to guide a plaintiff's future conduct in order to preserve legal rights," but "courts are not precluded from reaching issues before actual injuries or losses have occurred." *Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America v Central Mich Univ Trustees*, 295 Mich App 486, 495; 815 NW2d 132 (2012).

"A writ of mandamus is an extraordinary remedy that will only be issued if '(1) the party seeking the writ has a clear legal right to the performance of the specific duty sought, (2) the defendant has the clear legal duty to perform the act requested, (3) the act is ministerial, and (4) no other remedy exists that might achieve the same result.' " *Detroit City Clerk*, 295 Mich App at 366-367 (citation omitted).

With respect to whether a permanent injunction should issue, in *Kernen v Homestead Dev Co*, 232 Mich App 503, 514-515; 591 NW2d 369 (1998), this Court noted the following factors to take into account:

> "(a) the nature of the interest to be protected, (b) the relative adequacy to the plaintiff of injunction and of other remedies, (c) any unreasonable delay by the plaintiff in bringing suit, (d) any related misconduct on the part of the plaintiff, (e) the relative hardship likely to result to defendant if an injunction is granted and to plaintiff if it is denied, (f) the interests of third persons and of the public, and (g) the practicability of framing and enforcing the order or judgment." [Citation omitted; quotation format condensed.]

Courts balance the benefit of an injunction to a requesting plaintiff against the damage and inconvenience to the

defendant, granting an injunction as appears most consistent with justice and equity under all the surrounding circumstances of the particular case. *Id.* at 514.

E. DISCUSSION

1. PERSIA

With respect to plaintiffs' arguments under PERSIA, they contend that WCCO, §§ 141-32 and 141-36, as amended by Wayne County Enrolled Ordinance No. 2010-514,[17] violate MCL 38.1133(6) and MCL 38.1140m by taking a credit against retirement system trust assets, for the benefit of a party in interest—i.e., the County—during a period of underfunding. Additionally, plaintiffs argue that the 2010 ordinance violates MCL 38.1133(1) and MCL 38.1140m by taking a credit against retirement system trust assets, for the benefit of the County, that circumvents the discretion of the Retirement Commission. Finally, plaintiffs assert that the 2010 ordinance violates MCL 38.1140m by treating retirement system trust assets as though they were assets of the County and by imposing amortization periods and caps that override the Retirement Commission's discretion. The trial court, in granting summary disposition in favor of defendants on plaintiffs' PERSIA claims, ruled that MCL 38.1140m does not prohibit or address the transfer of IEF assets to satisfy the County's ARC obligation. In regard to the remainder of plaintiffs' PERSIA-based arguments, the trial court simply expressed agreement with the arguments proffered by defendants in their brief, which arguments, when relevant, will be discussed later.

---

[17] Hereafter, we shall simply refer to "the 2010 ordinance" when speaking of Wayne County Enrolled Ordinance No. 2010-514 and its amendatory effect on WCCO, §§ 141-32 and 141-36.

(a) VIOLATION OF THE EXCLUSIVE-BENEFIT RULE—MCL 38.1133(6)

We hold that the offset provision in the 2010 ordinance directly conflicts with and violates the exclusive-benefit rule embodied in MCL 38.1133(6). A municipal ordinance that is in direct conflict with a state statute is preempted by state law. *Rental Prop Owners Ass'n of Kent Co v Grand Rapids*, 455 Mich 246, 257; 566 NW2d 514 (1997). MCL 38.1133[18] provided in relevant part:

> (1) The provisions of this act shall supersede any investment authority previously granted to a system under any other law of this state.
>
> *       *       *
>
> (6) *The system shall be a separate and distinct trust fund and the assets of the system shall be for the exclusive benefit of the participants and their beneficiaries* and of defraying reasonable expenses of investing the assets of the system. . . . [Emphasis added.]

The "system" here is the Wayne County Employees Retirement System,[19] which, under MCL 38.1133(6), constitutes a separate and distinct trust fund. With respect to whether particular assets are included in "assets of the system," MCL 38.1132a provides that the term " '[a]ssets,' for the purpose of meeting asset limitations contained in . . . [PERSIA], means the total of the cash and investments of a system valued at market." MCL 38.1133(6) is not concerned with asset limitations; therefore, we shall not rely on the statutory definition in MCL 38.1132a. That said, the phrase

---

[18] MCL 38.1133 was recently amended by 2012 PA 347, effective March 28, 2013. We are quoting the previous version of MCL 38.1133, which governs in this case.

[19] For purposes of PERSIA, "system" is defined as "a public employee retirement system created and established by this state or any political subdivision of this state." MCL 38.1132e(5).

"assets of the system" is clearly broad in scope and comprehensive, and it would necessarily encompass all assets held by the Retirement System, including the defined benefit plan assets and the assets in the IEF. There is no argument to the contrary. Accordingly, pursuant to MCL 38.1133(6), the IEF assets "shall be for the exclusive benefit of the participants and their beneficiaries," along with being available for use to defray reasonable investment-related expenses.

"The Legislature's use of the word 'shall' in a statute generally 'indicates a mandatory and imperative directive.' " *Costa v Community Emergency Med Servs, Inc*, 475 Mich 403, 409; 716 NW2d 236 (2006), quoting *Burton v Reed City Hosp Corp*, 471 Mich 745, 752; 691 NW2d 424 (2005). The term " 'exclusive' is defined as 'not divided or shared with others [or] single or independent; sole.' " *Northville Charter Twp v Northville Pub Schs*, 469 Mich 285, 292; 666 NW2d 213 (2003), quoting *The American Heritage Dictionary of the English Language* (1981). A "benefit" is " 'something that is advantageous or good; an advantage.' " *Ottawa Co v Police Officers Ass'n of Mich*, 281 Mich App 668, 673; 760 NW2d 845 (2008), quoting *Random House Webster's College Dictionary* (1992). Thus, for purposes of complying with MCL 38.1133(6), it was imperative and mandatory that assets in the IEF be held solely for the good of participants and beneficiaries, who alone could use those assets to their advantage—not the County, the County Board, or anyone else for that matter.

There can be no dispute that, before the 2010 ordinance went into effect, the IEF assets were held and used for the exclusive benefit of participants and their beneficiaries. With the enactment of the 2010 ordinance, the "excess" IEF assets in the amount of $32 million, as created by the newly imposed $12 million

IEF cap on a preexisting $44 million IEF balance, absolutely had to retain their status as assets "for the exclusive benefit of the participants and their beneficiaries" to comply with MCL 38.1133(6). We conclude, however, that as a result of the 2010 ordinance, the County obtained the authority to use the excess IEF assets advantageously and for its own financial good and benefit. Regardless of the fact that, by operation of the 2010 ordinance, the excess assets—once part of the IEF and now part of the defined benefit plan assets on the accounting records—were still to be used for the benefit of participants and their beneficiaries in the form of regular pension payments, the County also enjoyed an enormous cost savings benefit. Accordingly, it cannot be said that assets of the system were held or used "for the *exclusive* benefit of the participants and their beneficiaries." (Emphasis added.)

The 2010 ordinance required that the amount in the IEF in excess of the $12 million dollar limit be debited from the IEF and credited to the defined benefit plan assets, with the ordinance mandating use of the $32 million excess to offset or reduce the County's ARC. Therefore, the 2010 ordinance resulted in a $32 million reduction, not directly in the actuarially based ARC calculation itself, but in the amount of money that the County had to take directly from its own coffers in order to satisfy the ARC obligation. The $32 million savings, which we decline to characterize as a minor or an incidental benefit, freed up County funds for other uses. To describe the effect of the 2010 ordinance as not being beneficial to the County is to wholly ignore the motive behind enacting the ordinance in the first place and the resulting fiscal reality.[20] The fact that the assets were

---

[20] In the summer of 2010, the County had proposed to temporarily suspend the 13th-check payments until the Retirement System was fully

used for the County's benefit is further made evident upon examination of WCCO, § 141-32(f), which contemplated the County's chief financial officer exploring the issuance of bonds as a strategy to *"reimburse* the Inflation Equity fund of $32 million dollars." (Emphasis added.) The concept of reimbursement necessarily entails an original benefit conferred upon and used by the reimbursing party.

Had the 2010 ordinance not been enacted, $32 million would have been added to the defined benefit plan assets by the County in the ARC, and the IEF would have retained its $44 million balance. With the enactment of the 2010 ordinance, $32 million still ended up being added to the defined benefit plan assets, so the enactment made no difference on that matter, but the IEF balance was decreased by $32 million down to $12 million. We find it difficult, therefore, to conclude that Retirement System members truly remained benefited in relationship to the $32 million after the 2010 ordinance's enactment, considering that the Retirement System unquestionably lost $32 million, and we find it impossible to conclude that the County was not benefited, as if the $32 million simply evaporated to no one's advantage.

---

funded again; however, the proposal was rejected by the County Board. In an August 24, 2010, letter from the human resources director to county employees, he communicated the proposal's rejection and warned that the likely result would be 400-500 layoffs of county employees on October 1, 2010, as the County would be forced to eliminate several programs and services. The letter concluded by indicating that the County would "continue[] to explore every available option to address the enormous budget challenges that continue to confront [it]," as "[t]he alternative [would] be unfortunate indeed." The option that eventually came to fruition was the 2010 ordinance. Given this context, the County undoubtedly enjoyed a financial benefit in being able to reach and use the $32 million in the IEF through the enactment of the 2010 ordinance.

We find it important to emphasize the nature and operational effect of the 2010 ordinance. From the sole perspective of an individual retiree or survivor beneficiary, payment of a 13th check cannot be viewed as an accrued financial benefit because there is no vested or enforceable right to a 13th check, given the discretionary distribution language that has always been part of the IEF ordinance and the lack of any CBA language requiring disbursement of a 13th check. See *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 313-315; 806 NW2d 683 (2011); *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 653-654; 698 NW2d 350 (2005); *Shelby Twp*, 438 Mich at 254 n 3; *Kosa v State Treasurer*, 408 Mich 356, 370-371; 292 NW2d 452 (1980). However, once a particular dollar amount, if any, was arrived at under the IEF formula, including the discretionary components controlled by the Retirement Commission, the IEF ordinance had always *compelled or mandated* the allocation or crediting of said amount to the IEF.[21] And the assets in the IEF were dedicated for use by retirees and survivor beneficiaries in the form of a 13th check as a hedge against inflation. By September 30, 2010, the IEF had an accumulated balance of approximately $44 million that was intended and designated for 13th-check distributions; indeed, there had never been, for the most part, any other permitted use of IEF assets.[22] The IEF, in and of itself, can be accu-

---

[21] The three previous versions of the IEF ordinance all dictated that, at the end of each fiscal year, the Retirement Commission "shall credit" assets to the IEF pursuant to the formula; however, with the 2010 ordinance, the language, as reflected in WCCO, § 141-32(b)(1), was changed to "may credit."

[22] The various versions of the IEF ordinance did permit the Retirement Commission to use a portion of the IEF assets to provide minimum permanent pensions. Judith Kermans stated that "the provisions for

rately characterized as a reserve belonging to and vested in the Retirement System's participants as a whole, outside the reach of defendants, to be used to assist retirees and survivor beneficiaries in fighting the devaluing of the dollar by inflation.[23]

Instead of honoring and protecting the IEF in connection with its designed purpose, the County Board improperly invaded the assets of the IEF to lessen its financial burden with respect to the ARC. The 2010 ordinance dipped into assets that had already been set aside for a particular purpose pursuant to the requirements of previous versions of the IEF ordinance. The 2010 ordinance essentially authorized retroactive application of the $12 million IEF cap, capturing and diverting assets pledged for a different use. Aside from providing for minimum permanent pensions and inflation equity, the IEF ordinance had never previously authorized any other use, nor did it contain any language suggesting that existing IEF assets could be tapped or diverted by defendants after allocation to the IEF. Defendants had no legal basis to exercise dominion

---

minimum permanent pension payments were complied with in the past through a transfer by the Retirement System of funds from the IEF reserve to the defined benefit assets in order to cover the increased pension costs for those that qualified for the minimum permanent pension payments." Minimum permanent pensions are not at issue.

[23] Indeed, from a broad perspective, taking into consideration not individual retirees or survivor beneficiaries but all of them together as a group, the 13th-check program itself could arguably be viewed as an accrued financial benefit for purposes of the first clause contained in Const 1963, art 9, § 24, which benefit was diminished and impaired by the transfer of $32 million out of the IEF. "[T]here exists a general presumption by this Court that we will not reach constitutional issues that are not necessary to resolve a case." *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993), citing *Taylor v Michigan*, 360 Mich 146, 154; 103 NW2d 769 (1960). Because the offset issue can be resolved under PERSIA, we ultimately decline to rule on whether it violates Const 1963, art 9, § 24.

and control over IEF assets for its own benefit once they were in the IEF and under the control of the Retirement Commission.

Our characterization of the 2010 ordinance, the IEF, and their relationship to each other finds support in the documentary evidence. In her affidavit, Judith Kermans voiced her understanding that establishment of the IEF was required by ordinance, that the IEF was created "for the payment of cost of living payments, commonly referred to as the 13th check," that the IEF was funded by "a portion of investment earnings over a minimum earnings requirement (threshold) established by the Retirement Commission," and that "the County has never made additional contributions specifically to . . . the IEF." Augustus Hutting, an attorney and former chair of the Retirement Commission who had served on it for 20 years, averred in his affidavit that "[t]he IEF Ordinance does not permit the Retirement System to use the IEF reserve for any purpose other than payment of the specific benefits set forth in the Ordinance, i.e. 13th Checks and the minimum permanent pension payments which were taken care of many years ago." This same averment was made by Ronald Yee, who was director of the Retirement System from 1997 to 2010 and a former trustee. Hutting also asserted that the trustees followed "the mandate of the IEF Ordinance to maintain, manage[,] and administer the 13th Check benefit in accordance with the IEF Ordinance, as it changed from time to time."

Next, we deem it necessary to distinguish the offset under the 2010 ordinance from the typical offset referred to in MCL 38.1140m. As part of PERSIA, MCL 38.1140m provides that, "[i]n a plan year, any current service cost payment may be offset by a credit for amortization of accrued assets, if any, in excess of

actuarial accrued liability." Here, there is no dispute that the amortized accrued assets of the defined benefit plans did not exceed the actuarial accrued liability of the plans, that the plans were underfunded when the 2010 ordinance was enacted and had been for several years, and that the offset employed under the 2010 ordinance was not based on the offset language in MCL 38.1140m. The statutory offset concerns healthy pension plans that are overfunded and enjoy a surplus—that is, the accrued assets exceed accrued liabilities. Examined within the context of MCL 38.1140m, the IEF assets were simply not surplus assets. With respect to a legally sound offset under MCL 38.1140m, excess pension assets, which are designated to be used to cover pension payments and are already part of a retirement system's trust fund, could be viewed as being used for the benefit of the public employer by effectively diminishing the employer's ARC. Such an offset, therefore, has attributes and operates in a manner suggesting a violation of the exclusive-benefit rule in MCL 38.1133(6). However, the Legislature directly and specifically authorized the offset in MCL 38.1140m in regard to true surplus situations, and "[i]t is . . . axiomatic that 'where a statute contains a general provision and a specific provision, the specific provision controls.' " *Duffy v Dep't of Natural Resources*, 490 Mich 198, 215; 805 NW2d 399 (2011) (citation omitted). The apparent protection against invalidation under the exclusive-benefit rule that is accorded to offsets pursuant to MCL 38.1140m is simply not implicated with respect to the offset in the 2010 ordinance.

In sum, the 2010 ordinance violated the exclusive-benefit rule of MCL 38.1133(6) by authorizing the County to take advantage of and benefit from the use of assets of the Retirement System, IEF assets, instead of leaving those assets in place for the exclusive benefit of

the participants and their beneficiaries. The County, in raiding the IEF for its own benefit, depleted and redirected IEF assets that had been designated for a purpose other than payment of regular pension benefits, i.e., payment of 13th checks, circumventing the intent of the IEF ordinance. We next address and reject defendants' argument, premised on foreign rulings, that the exclusive benefit rule does not invalidate the offset in the 2010 ordinance.

(b) RULINGS OUTSIDE MICHIGAN REGARDING THE
EXCLUSIVE-BENEFIT RULE

Defendants argue in their appellate brief, and insisted at oral argument, that the 2010 ordinance does not violate or conflict with the exclusive-benefit rule in MCL 38.1133(6) under the analysis in *Hughes Aircraft Co v Jacobson*, 525 US 432; 119 S Ct 755; 142 L Ed 2d 881 (1999), and *Claypool v Wilson*, 4 Cal App 4th 646; 6 Cal Rprt 2d 77 (Cal Ct App, 1992), because retirement assets in the IEF continued to be used for the exclusive benefit of members and not for the County's own benefit. Any incidental benefit enjoyed by the County, according to defendants, is insufficient to constitute a violation of PERSIA.

We initially note that, even if the cases cited by defendants can be deemed analogous, they are not binding on us in relationship to our interpretation of PERSIA and we decline to apply their holdings. The plain and unambiguous language of MCL 38.1133(6) supports our analysis and conclusion. However, because much of defendants' argument on the issue is devoted to *Hughes* and *Claypool*, we will engage in an examination of both cases.

In *Hughes*, retired beneficiaries of a defined benefit plan sued, in a class action, their former employer

Hughes and the company's retirement plan itself, claiming they had violated the Employee Retirement Income Security Act of 1974 (ERISA), 29 USC 1001 *et seq.*, by amending the plan to provide for an early retirement program and a noncontributory benefit structure. As a result of employee and employer contributions over the years and investment growth, the assets of the plan had come to substantially exceed the amount necessary to fund all current and future defined benefits. Because of the surplus, Hughes suspended its employer contributions in 1987. In 1989, Hughes amended the plan to establish an early retirement program pursuant to which significant additional retirement benefits were offered to particular active eligible employees. The plan was then amended again two years later in 1991, with new participants not being permitted to contribute to the plan and thereby receiving fewer benefits. Existing members had the option to continue making contributions or be treated as new participants. *Hughes*, 525 US at 435-436.

The retirees argued, in part, that Hughes violated 29 USC 1103(c)(1), ERISA'a anti-inurement prohibition, "by benefiting itself at the expense of the [p]lan's surplus." *Id.* at 437. More particularly, they contended that "the creation of the new contributory structure permitted Hughes to use assets from the surplus attributable to employer *and* employee contributions for its sole and exclusive benefit, in violation of ERISA's anti-inurement provision." *Id.* at 441. ERISA's anti-inurement provision stated that a plan's assets " 'shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.' " *Id.* at 442, quoting 29 USC 1103(c)(1).

The United States Supreme Court initially noted that "[s]ince a decline in the value of a [defined benefit] plan's assets does not alter accrued benefits, members similarly have no entitlement to share in a plan's surplus—even if it is partially attributable to the investment growth of their contributions." *Hughes*, 525 US at 440-441. Here, retirees and survivor beneficiaries *as a group* had an entitlement to share in the IEF assets at some juncture, as those assets had been specifically allocated and were intended for distribution to retirees and survivor beneficiaries in the form of 13th checks. The *Hughes* Court proceeded to reject the retired beneficiaries' anti-inurement argument, holding:

> As the language [in 29 USC 1103(c)(1)] makes clear, the section focuses exclusively on whether fund assets were used to pay pension benefits to plan participants, without distinguishing either between benefits for new and old employees under one or more benefit structures of the same plan, or between assets that make up a plan's surplus as opposed to those needed to fund the plan's benefits. [The retirees] do not dispute that Hughes used fund assets for the sole purpose of paying pension benefits to [p]lan participants. Furthermore, at all times, Hughes satisfied its continuing obligation under the provisions of the [p]lan and ERISA to assure that the [p]lan was adequately funded. In other words, Hughes did not act impermissibly by using surplus assets from the contributory structure to add the noncontributory structure to the [p]lan. The act of amending a pre-existing plan cannot as a matter of law create two *de facto* plans if the obligations (both preamendment and postamendment) continue to draw from the same single, unsegregated pool or fund of assets. ERISA provides an employer with broad authority to amend a plan, and nowhere suggests that an amendment creating a new benefit structure also creates a second plan. Because only one plan exists and [the retirees] do not allege that Hughes used any of the assets for a purpose other than to pay its obligations to the [p]lan's beneficiaries, Hughes could not

have violated the anti-inurement provision under ERISA § 403(c)(1). [*Hughes*, 525 US at 442-443 (citations omitted).][24]

Consistently with our earlier discussion, we conclude that the $32 million in the IEF that was shifted to the defined benefit plan assets simply did not constitute true "surplus" assets. Rather than having a surplus of assets, the defined benefit plans were severely underfunded. And while we appreciate that IEF assets and defined benefit plan assets were pooled together in a single trust fund, the IEF assets were indeed segregated in terms of accounting records. Although the redirected IEF assets would still ultimately go to retirees and survivor beneficiaries under the 2010 ordinance, the IEF was created as a distinct and separate reserve that was never devoted to the payment of standard accrued pension benefits, but was instead primarily intended and designed for the payment of 13th checks. As opposed to the facts in *Hughes*, under the directives of the 2010 ordinance, the pension payment obligations did not genuinely continue to draw from the same single unsegregated fund of assets, given that the excess IEF assets would now be used to help cover regular pension payments. And, although their assets were pooled and invested together, the IEF received individualized treatment that was distinguishable from that given to the fund of defined benefit plan assets, effectively resulting in fund segregation.

We cannot conclude that taking assets from the IEF and adding them to the defined benefit plan's assets is comparable to using legitimate surplus assets from the old contributory structure of the Hughes plan to add

---

[24] We note that the *Hughes* Court, in the context of the anti-inurement discussion, failed to explain why Hughes was not receiving a benefit, such that use of the retirement assets by plan participants was truly *exclusive*.

the noncontributory structure, because the assets in the Hughes plan were always and remained pure defined benefit plan assets. In other words, money contributed by employees during their employment with Hughes, which employees later became the retirees filing suit, was never earmarked for anything but the future distribution of defined benefit plan payments to retirees in general. That is simply not the case here, where certain monies were earmarked for the IEF and the 13th-check program and then later appropriated by the County, much to its benefit, in order to pay the ARC. In defendants' appellate brief, they acknowledge that "the evidence is undisputed that the assets held in the IEF are *not* Defined Benefit Plan assets." As Judith Kermans stated, IEF assets are "walled off." *Hughes* did not have to contend with anything comparable to the underlying IEF ordinance and its mandates that controlled for over 20 years. The excess IEF assets created by the 2010 ordinance unmistakably inured to the benefit of the County. It was as if the County Board reached into the pockets of the Retirement System, retrieved Retirement System funds previously allocated to the IEF for 13th checks under the County Board's very own ordinance, and then handed the funds back to the Retirement System for purposes of the ARC, pretending it was County money and depriving the Retirement System of $32 million.

Another relevant aspect of *Hughes* was the argument by the retired beneficiaries that Hughes breached its fiduciary duties under ERISA by amending the plan in 1991 to create the noncontributory structure in violation of 29 USC 1106(a)(1)(D). *Hughes*, 525 US at 437. ERISA prohibits a fiduciary from, with actual or constructive knowledge, causing the retirement plan to engage in a transaction that "constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a

party in interest, of any assets of the plan[.]" 29 USC 1106(a)(1)(D).[25] The *Hughes* Court first held that the fiduciary claim failed because plan sponsors, such as Hughes, who merely alter the form, structure, or other terms of a plan are not fiduciaries. *Hughes*, 525 US at 443-445. The United States Supreme Court acknowledged a possible exception for sham transactions that were " 'meant to disguise an otherwise unlawful transfer of assets to a party in interest[.]' " *Id.* at 445, quoting *Lockheed Corp v Spink*, 517 US 882, 895 n 8; 116 S Ct 1783; 135 L Ed 2d 153 (1996). After indicating that the retired beneficiaries had raised the "sham transaction" exception, the *Hughes* Court proceeded to analyze the substance of their claim, concluding that it still failed because the incidental benefits conferred upon Hughes in amending the plan, such as lower labor costs, were not impermissible under ERISA. *Hughes*, 525 US at 445. The Supreme Court, in examining the concept of incidental benefits, stated:

> "[A]mong the 'incidental' and thus legitimate benefits that a plan sponsor may receive from the operation of a pension plan are attracting and retaining employees, paying deferred compensation, settling or avoiding strikes, providing increased compensation without increasing wages, increasing employee turnover, and reducing the likelihood of lawsuits by encouraging employees who would otherwise have been laid off to depart voluntarily." [*Id.*, quoting *Lockheed Corp*, 517 US at 893-894.]

Again, we cannot conclude that saving $32 million was "incidental" in any sense of the word. To the extent that *Hughes* supports a contrary conclusion, we again decline to apply *Hughes*. The term "incidental" is

---

[25] The applicable version of PERSIA had a comparable provision—then MCL 38.1133(6)(c), currently MCL 38.1133(8)(c)—that provides additional support for our ruling that the offset was statutorily invalid. It is addressed in the next section of this opinion.

defined as "happening or likely to happen in an unplanned or subordinate conjunction with something else," or "incurred casually and in addition to the regular or main amount[.]" *Random House Webster's College Dictionary* (2001). It cannot honestly and reasonably be disputed that the main purpose of the 2010 ordinance was to benefit the County by reducing the amount of money that the County had to directly pay to satisfy the ARC. The benefit was certainly not unplanned or incurred casually.

An aspect of *Hughes* that differs entirely from the case at bar is that the plan amendments made by Hughes in adding the noncontributory structure to the plan was clearly not motivated by financial desperation and the need for a quick fix. To a great extent, *Hughes* stands for the unremarkable proposition that an employer, for purposes of ERISA,[26] can use surplus defined benefit plan assets as an offset against required contributions. Indeed, WCCO, § 141-32(e), as codified and added by the 2010 ordinance, provides that "[n]othing in this section shall preclude the County from reducing or eliminating its contribution for a fiscal year in which defined benefit assets exceed defined benefit liabilities." This "surplus" and "offset" provision, which is not applicable to the offset at issue, is generally consistent with *Hughes*, although plaintiffs do cursorily argue that WCCO, § 141-32(e), is problematic because it places the authority with the County to invoke the offset and not the Retirement Commission. We visit that argument later. *Hughes* is also consistent with MCL 38.1140m,

___

[26] We note that ERISA has no application to the Wayne County Employees Retirement System because it is a governmental pension plan. *In re Pensions of 19th Dist Judges under Dearborn Employees Retirement Sys*, 213 Mich App 701, 707; 540 NW2d 784 (1995) (noting that "ERISA does not apply to Dearborn's retirement system because it is a governmental plan"), citing 29 USC 1002(32) and 1003(b)(1).

which, as stated earlier, provides that, "[i]n a plan year, any current service cost payment may be offset by a credit for amortization of accrued assets, if any, in excess of actuarial accrued liability." We have already explained that the offset in the 2010 ordinance is not based on the offset provision in MCL 38.1140m, thereby relegating the ordinance offset to the dictates of the exclusive-benefit rule. We conclude that *Hughes* provides no basis to reevaluate or question our construction and application of the exclusive-benefit rule in MCL 38.1133(6).

In *Claypool*, a California statute repealed three different supplemental COLA programs and diverted funds from those programs for use by employers of public employees as an offset to contributions the employers were otherwise required to make to fund public employee pensions. The petitioners argued "that the use of the former supplemental COLA funds to reduce employer contributions violate[d] [the] California Constitution," which stated that public pension assets were trust funds to " 'be held for the exclusive purposes of providing benefits to participants in the pension . . . system and their beneficiaries and defraying reasonable expenses of administering the system.' " *Claypool*, 4 Cal App 4th at 673, quoting Cal Const, art 16, § 17(a). The California appellate court held that there was no constitutional violation, given that the former COLA funds continued to be held for the exclusive purpose of providing pension benefits. *Claypool*, 4 Cal App 4th at 674. We note that two of the three former COLA programs were enacted under statutes warning that the benefits "may be available for only a limited period of time." *Id.* at 655-656. Moreover, the statute governing the third COLA program also indicated that availability may be limited, and the petitioners further conceded that the funds from this program, based on its

mode of operation, had already "bec[o]me employer assets for purposes of the effect on the employers' contribution obligations" before the enactment of the challenged statute that repealed the three supplemental COLA programs and created the offset. *Id.* at 657.

Here, the IEF did not have the limiting or restrictive language used in the former COLA programs at issue in *Claypool*.[27] We also note that with the statutory repeal of the three supplemental COLA programs, the California Legislature did enact a new alternative COLA program. *Claypool*, 4 Cal App 4th at 658. Although in the context of a different appellate argument, the *Claypool* court stated that "[t]he saving of public employer money is not an illicit purpose if changes in the pension program are accompanied by comparable new advantages to the employee." *Id.* at 665. In this case, there were no comparable new advantages to county retirees; the 13th-check program was eviscerated absent mandatory reimbursement of the $32 million. And, according to the actuary expert, Judith Kermans, the addition of the $32 million IEF excess to the defined benefit assets merely increased the plan from being 60 percent funded to 61 percent funded, a *de minimis* amount. To the extent that *Claypool* is analogous and supports a different conclusion than that we reach here, we decline to follow *Claypool*, which we view as an aberration.

### (c) VIOLATION OF THE PROHIBITED-TRANSACTION RULE—MCL 38.1133(6)(c)

Under the applicable version of MCL 38.1133(6)(c), and comparable to the ERISA provision discussed in

---

[27] We acknowledge that the California court, in rendering its ruling, did not specifically refer to the limited nature of the COLA programs; therefore, we cannot ascertain with any certainty that the court considered the matter to be of any relevance.

*Hughes*, "an investment fiduciary shall not cause the system to engage in a transaction if he or she knows or should know that the transaction is . . . , either directly or indirectly[,] . . . [a] transfer to, or use by or for the benefit of, the political subdivision sponsoring the system of any assets of the system for less than adequate consideration." The plain and unambiguous language of the statute absolutely prohibits the Retirement Commission, an investment fiduciary, MCL 38.1132c(1), from, with actual or constructive knowledge, causing the Retirement System to engage in a transaction that directly or indirectly allows assets of the Retirement System to be used by or for the benefit of the County, a political subdivision sponsoring the system, for less than adequate consideration. We conclude that, in violation of MCL 38.1133(6)(c), the 2010 ordinance effectively forced the Retirement Commission to knowingly cause the Retirement System to engage in a transaction that directly or indirectly permitted or authorized the County to use or benefit from the use of assets in the IEF absent any consideration. Stated otherwise, the 2010 ordinance required the Retirement Commission to breach a fiduciary duty, engaging the Retirement System in a prohibited transaction.

The reallocation or transfer of IEF assets certainly constituted a "transaction" for purposes of MCL 38.1133(6)(c). Even defendants acknowledge in their appellate brief that the 2010 ordinance "authorize[d] the transfer of funds from the IEF to the Defined Benefit Plans." Furthermore, the 2010 ordinance required a debiting and crediting of assets to and from the IEF and defined benefit plan, which would qualify as an administrative task performed by the Retirement Commission. See MCL 38.1133(2); Wayne County Charter, § 6.112; *Detroit Policemen & Firemen Retirement Sys Bd of Trustees*, 270 Mich App at 75 (board of trustees

has the responsibility for administering, managing, and operating retirement system); *Wayne Co Retirement Comm*, 267 Mich App at 234 ("The Retirement Commission is the administrative body responsible for overseeing the operational and administrative functions of the Retirement System.").[28] Accordingly, the 2010 ordinance effectively required the "investment fiduciary . . . [to] cause the system to engage in a transaction[.]" MCL 38.1133(6). We have already found, relative to our analysis of the exclusive-benefit rule, that the County benefited greatly from the use of the excess IEF assets. We recognize that defendants are not investment fiduciaries and that they set into motion the prohibited transaction; however, we conclude that it was a sham transaction involving, *effectively*, an unlawful transfer of assets to the County for use to satisfy obligations relative to the ARC. *Hughes*, 525 US at 445.

(d) SPECIFIC COUNTY CODE SECTIONS AND SUBSECTIONS

We hold that, for the reasons stated, the offset provision in the 2010 ordinance violates PERSIA, particularly the exclusive-benefit rule in MCL 38.1133(6)

---

[28] MCL 38.1133(2) provides that "[t]he assets of a system may be invested, reinvested, held in nominee form, and managed by an investment fiduciary subject to the terms, conditions, and limitations provided in this act." Pursuant to this statutory provision, it was the Retirement Commission that had management authority over "assets of [the] system," including the IEF assets. While we decline to express reliance on MCL 38.1133(2) as additional support for our ruling, it is arguable that the crediting and debiting aspect of the 2010 ordinance, whereby assets were moved out of the IEF by the County, was a purely managerial task reserved solely for the Retirement Commission under MCL 38.1133(2). Absent the shifting of assets under the 2010 ordinance from the IEF to the defined benefit plans, the offset against the ARC could not independently survive. We do note, however, that given our holdings regarding the exclusive-benefit rule and prohibited-transaction rule, even the Retirement Commission itself could not have employed the offset at issue.

and the prohibited-transaction rule in MCL 38.1133(6)(c). That said, we deem it necessary to carefully spell out the effect of our ruling on the various paragraphs in WCCO, §§ 141-32 and 141-36, which sections we are not invalidating in their entirety, and to also engage in some additional analysis on arguments not framed in terms of the offset issue. Notably, WCCO, § 1-17, provides that "[e]ach chapter, article, division or section or, whenever divisible, subsection of this Code is hereby declared to be severable; and the invalidity of any chapter, article, division, section or divisible subsection shall not be construed to affect the validity of any other chapter, article, division, section or subsection of this Code."

As discussed earlier, the language in WCCO, § 141-32(c) and (d), which concern Retirement Commission criteria for making 13th-check distributions, had been part of the IEF ordinance from the beginning; the 2010 ordinance did not alter the language, and the language has not been challenged by plaintiffs. Accordingly, those provisions are left untouched by our ruling. With respect to WCCO, § 141-32(f), this provision explores the possibility of reimbursement of the $32 million and is rendered moot by our ruling.

We next address WCCO, § 141-32(e), which was added by the 2010 ordinance, and which provides that nothing in the IEF ordinance "preclude[s] *the County* from reducing or eliminating its contribution for a fiscal year in which defined benefit assets exceed defined benefit liabilities." (Emphasis added.) As noted earlier, this is a surplus provision that allows for an offset when a defined benefit plan is overfunded. We conclude, on the basis of a concession by defendants, that this provision is invalid under MCL 38.1140m, but only to the extent that it makes the exercise of an offset a decision for the County and not the

Retirement Commission. We find no reason to void the remaining language in WCCO, § 141-32(e), which is indisputably legally sound. MCL 38.1140m sets forth the Retirement Commission's authority to determine an ARC through an actuary, and, once again, it also provides that, "[i]n a plan year, any current service cost payment may be offset by a credit for amortization of accrued assets, if any, in excess of actuarial accrued liability." Defendants' main contention in regard to MCL 38.1140m is that it only concerns defined benefit plan assets and associated ARCs, not a reserve such as the IEF, for which there is no ARC; therefore, the statute neither addresses nor bars the offset provided for in the 2010 ordinance. Defendants state that, with respect to the offset language in MCL 38.1140m, it is defined benefit plan assets "that may be used, *in the Retirement Commission's discretion*, to offset the County's ARC when the *Defined Benefit Plans* are overfunded." (Initial emphasis added.) Accordingly, with respect to WCCO, § 141-32(e), we must conclude that defendants would agree that the reference to "the County" being able to reduce or eliminate its ARC for a fiscal year when there is a surplus in defined benefit plan assets is inconsistent with MCL 38.1140m's offset provision, as the decision to allow an offset, according to defendants, is for the Retirement Commission. Given defendants' statement, we decline to independently determine whether MCL 38.1140m solely leaves an offset decision to the Retirement Commission at times of surplus relative to defined benefit plan assets and liabilities. We take no position on the matter, and this opinion is not to be construed as endorsing defendants' position.

In regard to WCCO, § 141-32(b)(3), which sets forth the debit from the IEF, the credit to the defined benefit plan assets, and the offset, it is invalidated as being in

violation of and in direct conflict with PERSIA.[29] Simi-larly, we invalidate, under PERSIA, the language in WCCO, § 141-36(a)(2), that provides for the reduction or elimination of the ARC pursuant to the offset in WCCO, § 141-32. In regard to WCCO, § 141-32(b)(1), which ad-dresses the formula for determining how much to credit or allocate to the IEF at the end of a fiscal year, the 2010 ordinance amended the formula language and changed the "shall credit" terminology to "may credit." These changes have not been challenged by plaintiffs; therefore, we leave them intact. However, WCCO, § 141-32(b)(1), also has a prefatory clause subjecting the IEF funding calculation to the $12 million limit, which is found in WCCO, § 141-32(a). With respect to the $12 million IEF balance cap, as well as the $5 million cap on the distribu-tion of IEF assets to retirees by the Retirement Commis-sion, which is found in WCCO, § 141-32(b)(2),[30] the

---

[29] We note that count II of the County's counterclaim asserted in part that even if the offset is determined to violate PERSIA, the debiting of the $32 million from the IEF and crediting of that amount to the defined benefit plan assets could survive invalidation of the offset. In other words, $32 million should still be added to the defined benefit plan assets and removed from the IEF, but the County would simply not be able to receive the $32 million ARC offset and savings. To the extent that this opinion has not already disposed of this argument, we reject it, as the County would still receive a benefit by additional funds being allocated to the defined benefit plan assets. Indeed, in the context of the County's cross-appeal and its argument that it has standing to raise fiduciary-duty claims, the County contends that it incurred a special injury and had a substantial interest that was detrimentally affected because of the effect on the ARC when the Retirement Commission failed to allow more funds to remain with the defined benefit plan assets, instead funneling the money to the IEF under its discretionary authority. Additionally, the shift of IEF funds to the defined benefit plan assets totally ignored the prior controlling versions of the IEF ordinance and the intent manifested therein. The transferred excess IEF assets must be reallocated back to the IEF and used for the purpose intended.

[30] WCCO, § 141-32(b)(2), also provides that, subject to the $5 million cap, "[t]he Retirement Commission shall establish the portion of the . . .

County had alleged in its counterclaim that should it be determined that the offset is invalid under MCL 38.1140m, the IEF dollar caps themselves could nonetheless survive scrutiny.

Although we have not invalidated the offset pursuant to MCL 38.1140m, we agree that the IEF dollar caps are generally sustainable with one important restriction. The $12 million cap on the IEF's balance absolutely cannot be employed in relationship to the approximately $44 million that was in the IEF, as previously allocated, at the time the 2010 ordinance was enacted. This conclusion must be reached given our holding regarding the offset and our determination that the excess $32 million could not legally be transferred to the defined benefit plan assets or elsewhere and should have remained part of the IEF until disposed of by the Retirement Commission according to the 13th-check program. Our holding today effectively results in the $32 million that was offset against the County's ARC being returned, restored, or credited to the IEF, with the County being required to satisfy its ARC obligations absent consideration of that $32 million. However, we conclude that the $12 million IEF limitation can operate prospectively and in a manner that does not infringe on the Retirement Commission's right to use the preexisting $44 million in the IEF for 13th-check distributions as intended and envisioned. A proper prospective application of the $12 million IEF limitation would entail limiting future funding of the IEF until it dropped below $12 million, which is exactly how WCCO, § 141-32(b)(1), operates and is presently structured, where it provides the formula for annual funding of the

[IEF] available for distribution to retired members and survivor beneficiaries[.]" This general discretionary language is consistent with the prior version of the IEF ordinance and is not challenged by plaintiffs.

IEF, subject to the $12 million IEF balance limit. Accordingly, WCCO, § 141-32(b)(1), remains wholly intact and WCCO, § 141-32(a)—the provision setting forth the $12 million IEF limit—also remains in effect, but with the caveat that the limit is inapplicable in regard to the previously existing $44 million (or $32 million excess) until those IEF assets are first reduced down to $12 million.[31] With respect to the $5 million dollar IEF distribution limit found in WCCO, § 141-32(b)(2), it is already prospective in nature, operating to limit disbursements made after the 2010 ordinance became effective.

With regard to any arguments that might conflict with our position on the $5 million and $12 million IEF caps, plaintiffs have not focused on challenging those limitations in and of themselves, instead building their arguments more around the offset and the $32 million reduction in the IEF. To the extent that plaintiffs' constitutional and statutory arguments can be construed to challenge the IEF dollar restrictions, absent contemplation of any offset, we remain of the view that the caps are legally sound. From the inception of the IEF, there have always been restrictions on the funding of the IEF with investment earnings, considering that a formula controlled the amount of monies that flowed into it. And with respect to IEF distributions by way of 13th checks, up until the enactment of Wayne County Enrolled Ordinance No. 2000-536 when it was left entirely to the Retirement Commission's discretion, the Retirement Commission was restricted in doling out

---

[31] We appreciate that return of the $32 million to the IEF might not bring it up to $44 million depending on any IEF disbursements made in the interim. Also, throughout this opinion we have used rounded or approximated numbers, but, for purposes of remand and implementation of our ruling, exact dollar amounts must of course be used.

13th checks to 20 to 50 percent of the IEF balance. The current restrictions, although in different form, are comparable.

Application of the $5 million *prospective* limitation on IEF disbursements, as well as the $12 million *prospective limitation* on the IEF's balance, simply does not result in any impairment or diminishment of accrued financial benefits for purposes of Const 1963, art 9, § 24. Individual retirees and survivor beneficiaries have never been legally or contractually entitled to a 13th check under the IEF ordinance, let alone a particular amount, so the $5 million IEF distribution cap is not constitutionally offensive. And while we have indicated that the IEF can be viewed as a vested reserve belonging and in relationship to the Retirement System's participants as a whole for purposes of 13th checks, the $5 million cap honors that status by still allowing the payment of 13th checks from the IEF, controlling the flow but only to a limited degree. And as long as the $12 million IEF balance cap is applied prospectively as directed in this opinion, there would likewise be no unconstitutional impairment or diminishment.

With respect to PERSIA, MCL 38.1140m appears to only address ARCs relative to defined benefit plans, along with the Retirement Commission's role in determining ARCs, which matters have no relevance to the IEF caps. Next, MCL 38.1133(2) empowers the investment fiduciary to invest, reinvest, hold in nominee form, and manage assets of a system. And as we previously acknowledged, the Retirement Commission oversees the operational and administrative functions of the Retirement System. *Detroit Policemen & Firemen Retirement Sys Bd of Trustees*, 270 Mich App at 75; *Wayne Co Retirement Comm*, 267 Mich App at 234. We conclude that the placement of a prospective $12 mil-

lion cap on the balance of the IEF and $5 million restriction on IEF disbursements to retirees and survivor beneficiaries concerns retirement plan parameters and structural aspects of the plan that are legislative in nature and within the purview of the County Board. See MCL 46.12a (authorizing county boards of commissioners to adopt and establish retirement plans and to set financial parameters subject to limitations imposed by law). The dollar limitations or caps relate to defining the extent of the IEF benefit, which is precisely what the County has also done in the context of setting forth in the WCCO the rights of members relative to various defined benefit plans. For example, with respect to defined benefit plan number two, WCCO, § 141-20(d)(2), currently provides that "[t]he amount of county-financed pension shall not exceed 75 percent of average final compensation." And again, limitations on the funding of the IEF and disbursement of 13th checks had been part of the IEF program for years by way of formulas imposed by the County. The IEF limitations do not intrude on any of the powers assigned solely to the Retirement Commission. It is also important to note that the Retirement Commission still plays a significant role in determining IEF matters. Subject to the caps, the Retirement Commission "may credit" to the IEF the excess rate of investment return and "shall establish the portion of the . . . [IEF] available for distribution to retired members and survivor beneficiaries[.]" WCCO, § 141-32(b)(1) and (2). This language remains effective. Also, the Retirement Commission retains control over setting the criteria with respect to 13th-check disbursements. WCCO, § 141-32(c) and (d). In sum, the IEF caps contained in the WCCO, in regard to prospective application as explained above, stand.

Although we have held that the $5 million and $12 million IEF-related caps, as confined by our opinion,

survive plaintiffs' challenge, the County Board is of course free to vote to repeal or amend those provisions should the County Board feel that the invalidation of the offset circumvents the intent or purpose behind the surviving provisions.[32]

Another aspect of plaintiffs' appeal concerns that component of the 2010 ordinance that modified WCCO, § 141-36, in regard to the actuarial formula and amortization periods used to determine the defined benefit ARC. We hold that the language in WCCO, § 141-36, that was added to the section pursuant to the 2010 ordinance is invalid under MCL 38.1140m, which provides in relevant part:

> The required employer contribution is the actuarially determined contribution amount. An annual required employer contribution in a plan under this act shall consist of a current service cost payment and a payment of at least the annual accrued amortized interest on any unfunded actuarial liability and the payment of the annual accrued amortized portion of the unfunded principal liability. . . . Except as otherwise provided in this section, for fiscal years that begin after December 31, 2005, the required employer contribution shall not be determined using an amortization period greater than 30 years. . . . A required employer contribution for a plan administered under this act shall allocate the actuarial present value of future plan benefits between the current service costs to be paid in the future and the actuarial accrued liability. The governing board vested with the general administration, management, and operation of a system or other decision-making body of a

_____

[32] For instance, the $12 million IEF balance limitation may have been arrived at in contemplation of the IEF's existing $44 million balance and the amount needed to satisfy the ARC, with the $5 million IEF distribution cap being set in relationship to the $12 million. The elimination of the offset, therefore, may call into question the continuing relevance of the dollar limitations. However, our role is restricted to determining the legality of the caps, and it is up to the County Board to decide whether it wishes to continue imposing the limitations absent the offset.

system shall act upon the recommendation of an actuary and the board and the actuary shall take into account the standards of practice of the actuarial standards board of the American academy of actuaries in making the determination of the required employer contribution.

As to WCCO, § 141-36(a)(1)(A), the 35-year cap on the amortization period directly conflicts with the statutory language providing for a 30-year cap. Moreover, with respect to the remaining amortization caps added to WCCO, § 141-36, through enactment of the 2010 ordinance, they conflict with the Retirement Commission's *sole* discretion in calculating the ARC through employment of an actuary and consideration of actuarial standards of practice. *Detroit Policemen & Firemen Retirement Sys Bd of Trustees*, 270 Mich App at 82-85 (amortization periods in Detroit City Code conflicted with MCL 38.1140m, thereby directly interfering with the governing board's authority to decide the annual contribution, including a determination of amortization periods). As this Court explained:

A plain reading of ... MCL 38.1140m[] compels the conclusion that, while the amortization period is capped at no greater than 30 years at the end of 2005, the actuary and the Board have discretion, within that limit, to determine the appropriate amortization period. Indeed, the ... language evidences the Legislature's intent to grant the Board the authority to determine the amortization period because it included limits (caps) in its grant of authority to the Board to determine the employer's annual contribution. Further, it is self-evident that, because the Board has the responsibility to determine the employer's annual contribution to the system and to ensure that the system is adequately funded, an integral element of that calculation is how much the city must annually contribute to pay down its unfunded liabilities. Again, how long those liabilities are amortized, according to the calculations of the actuary,

directly affects the adequacy of the system funding and the amount Detroit must pay each year.

Because MCL 38.1140m authorizes the Board to set the annual amortization periods, the statute conflicts with Detroit City Code, § 54–2–6, which dictates that, after 1974, the amortization period shall decrease one year each year from 30 years to 20 years and that, once the period reaches 20 years, the amortization rate shall remain at 20 years. Therefore, under the ordinance, by 1984, the amortization period would be 20 years and remain 20 years regardless of whether the Board and an actuary conclude that Detroit's contribution should be different. [*Id.* at 82-84.]

Accordingly, the County Board here acted outside of its authority by involving itself in actuarial ARC matters and the setting of amortization caps.[33]

### 2. CROSS-APPEAL—THE COUNTY'S COUNTERCLAIM

On cross-appeal, the County argues that the trial court erred by denying its motion for summary disposition and granting plaintiffs' motion for summary disposition with respect to count III of the County's counterclaim alleging breach of fiduciary duties. The County contends that the Retirement Commission owes fiduciary duties under state law and the WCCO. The County maintains that the Retirement Commission breached its fiduciary duties by holding the IEF harmless from investment losses, by making 13th-check distributions to ineligible defined contribution plan

---

[33] We note that the second sentence in WCCO, § 141-36(a)(2), was also added by the 2010 ordinance. It provides that "[t]he actuarial cost method shall be one which produces a contribution requirement not less than the contribution requirement produced by the individual entry-age normal cost method." Plaintiffs cursorily challenge this provision as an invasion of the Retirement Commission's authority and discretion in calculating, through an actuary, the ARC. We agree on the basis of MCL 38.1140m and its construction in *Detroit Policemen & Firemen Retirement Sys Bd of Trustees*, 270 Mich App at 82-85.

retirees, and by failing to maintain and implement written policies related to the management of the IEF. The County further argues that the Retirement Commission breached its fiduciary duties by, without any regard to the underfunded status of the defined benefit plans, setting the IEF investment return threshold rate at an unacceptable level, over-allocating funds to the IEF, and making large 13th-check distributions. The trial court ruled that there was no genuine issue of material fact that the Retirement Commission had discharged its duties in a manner consistent with MCL 38.1133(3). The trial court indicated that, although the County may disagree with the decisions made by the Retirement Commission, the County failed to present evidence indicating that the Retirement Commission breached its fiduciary duties.

We note that plaintiffs raise an unpreserved argument that the County lacked standing to present claims concerning the fiduciary duties of the Retirement Commission, because those duties are owed to members and plan participants and not the County. MCL 38.1133(3) does provide that "[a]n investment fiduciary shall discharge his or her duties solely in the interest of the participants and the beneficiaries[.]" We shall address the standing issue in the context of each of the fiduciary-duty claims. With respect to the preservation failure, we may overlook preservation requirements when an issue of law is raised and the facts necessary for its resolution have been presented, as is the case here. *Steward v Panek*, 251 Mich App 546, 554; 652 NW2d 232 (2002).

(a) FIDUCIARY DUTY PRINCIPLES AND INITIAL OBSERVATIONS

With respect to the issue of fiduciary duties under PERSIA, MCL 38.1133(3) provides in relevant part that an investment fiduciary shall:

(a) Act with the same care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity and familiar with those matters would use in the conduct of a similar enterprise with similar aims.

\* \* \*

(f) Prepare and maintain written objectives, policies, and strategies with clearly defined accountability and responsibility for implementing and executing the system's investments.

Similarly, WCCO, § 141-35(h), provides that, "[i]n exercising its discretionary authority with respect to the management of the assets of the retirement system, the retirement commission shall exercise the care, skill, prudence, and diligence, under the circumstances then prevailing, that an individual of prudence acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and similar objectives."

In analyzing the arguments raised by the County, we must, under MCL 38.1133(3), view the arguments in the context of whether the Retirement Commission discharged its duties and acted with the appropriate level of care, skill, prudence, and diligence relative to the best interests of the participants and beneficiaries, not defendants. The underlying premise of the County's fiduciary-duty claims is that priority had to be given to the care, viability, funding, and sustainability of the defined benefit plans over the IEF, given that payment of defined benefit pensions is obligatory, guaranteed, and constitutionally safeguarded, as opposed to the discretionary IEF distributions, which are bonus-like in nature. For the sake of argument, we shall assume the validity of that premise and proceed with our analysis.

(b) IEF AND INVESTMENT LOSSES

There is no dispute that IEF and defined benefit plan assets are pooled and invested together. The County points out that in some years there were large investment losses, such as $155 million in 2008 and $22 million in 2009.[34] This resulted in a reduction, according to the County, in the funded status of the defined benefit plans.[35] The County argues that, despite the fact that IEF monies were used for investment purposes, 100 percent of the investment losses were allocated to the defined benefit plans by the Retirement Commission, with the IEF being immune to the losses and held harmless. The County notes that the Retirement Commission even made millions of dollars in 13th-check disbursements during the years of heavy investment losses. In requests for admissions, plaintiffs conceded "that the IEF does not share in investment losses of the Retirement System." The County argues that the Retirement Commission breached its fiduciary duties by failing to allocate losses in proportion to and correlation with the IEF's percentage of the investment pool. For example, if defined benefit plan assets constituted 90 percent of the investment pool and IEF assets made up the remaining 10 percent, it would be prudent, in

---

[34] Plaintiffs note that those losses related to the return on the *market value* of assets, -15.20 percent for 2008 and -2.60 percent for 2009, and that with respect to the return on the *funding (actuarial) value* of the assets, which is used for purposes of the IEF formula, the numbers were 5.50 percent and 1.60 percent, respectively. This distinction would appear to create a disconnect in the logic of the County's argument.

[35] The following numbers reflect the funded percentage of the defined benefit plans over the years: 1986 — 92.61; 1987 — 90.46; 1988 — 92.65; 1989 — 94.86; 1990 — 94.49; 1991 — 100.52; 1992 — 95.85; 1993 — 96.41; 1994 — 97.77; 1995 — 94.24; 1996 — 100.00; 1997 — 100.54; 1998 — 97.04; 1999 — 105.51; 2000 — 108.56; 2001 — 106.38; 2002 — 103.22; 2003 — 98.90; 2004 — 94.83; 2005 — 91.96; 2006 — 89.43; 2007 — 81.05; 2008 — 73.58; 2009 — 67.23.

regard to a $100 million investment loss, to allocate $10 million in losses to the IEF, reducing its assets by that sum. The County complains that the Retirement Commission's failure to fairly allocate losses to the IEF inappropriately forced a greater percentage of the losses on the defined benefit plan assets, depleting the plan. The County maintains that the Retirement Commission's actions resulted in a *de facto* transfer of funds to the IEF even in years in which the IEF funding formula would not permit a credit to the IEF, thereby violating the IEF.

For purposes of this particular argument, we shall assume that the County has standing. As plaintiffs alluded, we note that while the IEF does not share in investment losses, it also does not necessarily proportionately share in investment gains. Only when the actual rate of return on the funding value of assets exceeds the threshold rate of return set by the Retirement Commission does the IEF enjoy the addition of new assets. And in a year in which there is an investment gain but the rate of return does not exceed the threshold rate, nothing flows into the IEF, even though IEF assets, pooled together with defined benefit plan assets, had all been invested together and saw a gain; the defined benefit plans are allocated all of the gains, with none going to the IEF.

We are not prepared to hold that the Retirement Commission had a fiduciary duty to allocate investment losses to the IEF. The IEF ordinance, which governs all the aspects or components of the IEF, has always been silent in regard to investment losses, except in the sense that if there were investment losses, no funds could be allocated to the IEF for the given year. The IEF ordinance, in its various versions, contemplated funding of the IEF only where the actual rate of return on invest-

ments exceeded the threshold rate set by the Retirement Commission. With a focus on the interests of the participants and beneficiaries, and assuming the preeminence of defined benefit plan assets in comparison to IEF assets, there perhaps is a logical argument that a fiduciary duty would entail proportionally allocating investment losses to the IEF. The problem with that position, in our view, is that were the Retirement Commission to allocate investment losses to the IEF, a disgruntled retiree who received a diminished 13th check could reasonably argue that the Retirement Commission violated the IEF ordinance, when it simply does not provide for depletion of the IEF on the basis of investment losses. A rational construction of the IEF ordinance is that it already takes into account a poor investment year by prohibiting a credit to the IEF if the threshold rate of return is not met and that, therefore, the intent of the County Board with regard to bad investment years was to go no further in harming the IEF than simply denying it funding for the year. And again, the IEF does not always enjoy an influx of assets even if there is a positive rate of return, despite IEF assets being part of the investment pool. It would have been quite simple for the County Board to include language in the IEF ordinance requiring an allocation of investment losses to the IEF, but this was never done. The County argues that the IEF ordinance is not the end-all and does not expressly prohibit allocation of investment losses to the IEF. We, however, conclude that a loss allocation could reasonably be construed as a violation of the IEF ordinance, such that we cannot conclude that the Retirement Commission had a fiduciary duty to make IEF loss allocations. Accordingly, we conclude that this particular fiduciary duty claim fails as a matter of law.

(c) DISCRETIONARY IEF MATTERS AND UNDERFUNDED STATUS OF
DEFINED BENEFIT PLANS

The County next argues that the Retirement Commission breached its fiduciary duties by failing to use reasonable care and prudence in setting the threshold investment rates of return for purposes of funding the IEF during years when the defined benefit plans were underfunded. The premise of this argument is that if the Retirement Commission set a higher threshold rate in a given year, a smaller amount of funds, if any, would have been credited to the IEF, thereby leaving more money for the defined benefit plans, which were in need of the money considering their underfunded status. The County also maintains that the Retirement Commission breached its fiduciary duties by failing to use reasonable care and prudence when it came to its authority to credit only a "portion of the excess" of investment earnings to the IEF under the IEF formula, which discretion was first granted to the Retirement Commission in 2000 pursuant to Wayne County Enrolled Ordinance No. 2000-536. The documentary evidence reflected that despite the Retirement Commission's flexibility since 2000 to only credit a portion of the excess investment earnings to the IEF, the full amount of the excess, when it existed, was credited entirely to the IEF by the Retirement Commission. The County asserts that, during times when the defined benefit plans were underfunded, the Retirement Commission had a fiduciary duty to exercise its discretion by limiting the amount of excess investment earnings credited to the IEF, thereby leaving more money for the needy defined benefit plans.

For purposes of the threshold-rate and portion-of-the-excess arguments, we shall assume that the County had standing. With respect to the substance of the two

arguments, the County focuses on those years after 2002 when the funded status of the defined benefit plans decreased steadily. In 2002, the defined benefit plans were 103.22 percent funded, and the percentage fell to 98.90 percent in 2003, decreasing a little bit more each year thereafter until reaching 67.23 percent in 2009. From 2002 through 2005, the Retirement Commission set the threshold rate of return at 8 percent each year. From 2002 through 2005, no money whatsoever was credited to the IEF, as the actual rate of investment return on the funding value of assets each of those years was below 8 percent. The setting of a higher threshold rate of return would therefore have been irrelevant during this period. Also, because of this fact, there was no need to exercise any discretion with respect to limiting the IEF allocation to only a portion of the excess investment earnings; there was no excess. Accordingly, if the County's argument is any way predicated on the years 2002 through 2005, it must fail.

After four straight years in which no money was added to the IEF, the Retirement Commission bumped up the threshold rate of return to 9 percent in 2006, which did produce a $10.6 million allocation to the IEF, where the actual rate of return was 10.35 percent, the excess rate was 1.35 percent, and the actuarial pension value was $789.5 million. In 2007, the Retirement Commission retained the 9 percent threshold rate, which produced a $23.2 million allocation to the IEF, where the actual rate of return was 11.74 percent, the excess rate was 2.74 percent, and the actuarial pension value was $848.7 million. As reflected in the numbers, in 2006 and 2007, the Retirement Commission did not exercise its discretion by way of limiting the excess investment earnings credited to the IEF to only a "portion of the excess." In 2008, the threshold rate of return was kept at 9 percent, but the actual rate of

return was 5.51 percent, so there was no allocation of assets to the IEF. In 2009, the threshold rate of return was once again set at 9 percent by the Retirement Commission. Because the actual rate of return was 1.59 percent, there was again no money credited to the IEF. Given these circumstances, the only possible years in which the Retirement Commission may have breached its fiduciary duties were 2006 and 2007, years in which the defined benefit plans were funded, respectively, at 89.43 percent and 81.05 percent.

We hold, as a matter of law, that reasonable minds would not differ in concluding that the Retirement Commission did not breach its fiduciary duties as argued by the County. There is no genuine issue of material fact, and the Retirement Commission is entitled to judgment as a matter of law. In regard to the threshold-rate argument, in and of itself, the Retirement Commission would have had to set the rate above 10.35 percent in 2006 and above 11.74 percent in 2007 in order to eliminate any IEF funding, which would have been a significant increase from the 8 percent in 2005. Regardless, the threshold rate argument is essentially subsumed in the portion-of-the-excess argument, which gave the Retirement Commission the discretion to, for the most part, disregard an excess rate of return by limiting the IEF funding to a portion of the excess.[36] After four straight years, 2002 to 2005, of absolutely zero funds being credited to the IEF, the Retirement Commission permitted a grand total of $33.8 million to pass to the IEF in a two-year period, which was modest by past comparisons and followed by two more years of

---

[36] The word "portion" would suggest that the Retirement Commission could not prevent 100 percent of the excess investment earnings from passing to the IEF, but could block all but a penny. See *Random House Webster's College Dictionary* (2001) (defining "portion" as "a part of a whole").

no additions to the IEF. There were six out of eight years in which the IEF received no funding. And while it is true that the defined benefit plans were underfunded in 2006 and 2007 and that 13th-check disbursements were made both years, in amounts lower, we note, than those made in the previous nine years, we cannot conclude, when viewed in context and in relationship to the years of no IEF funding, that allowing some funds to reach the IEF for a couple of years was financially imprudent. Assuming the supremacy of the defined benefit plans for purposes of a fiduciary duty, the Retirement Commission still had a fiduciary duty to provide some level of financial care to the IEF, assisting retirees and survivor beneficiaries in fighting inflation and paying bills. Also, the actuarial value of the pensions in 2006 was $789.5 million and $848.7 million in 2007, and the addition of $10.6 million in IEF assets in 2006 and $23.2 million in 2007 would have resulted in a minuscule change in the underfunded status of the defined benefit plans.[37]

Next, the County contends that the Retirement Commission breached its fiduciary duties by issuing 13th checks from the IEF without regard to the underfunded status of the defined benefit plans. As reflected earlier in this opinion, millions of dollars in IEF disbursements were made by the Retirement Commission every single year for the life of the IEF program, including years

---

[37] Although not argued by the Retirement Commission, we are troubled by the timing of the County's counterclaim. The counterclaim was filed on January 31, 2011, and the County is complaining about fiduciary breaches in 2006 and 2007, which would have been known at the time for purposes of accrual. The statute of limitations for breach of a fiduciary duty is three years. MCL 600.5805(10); *The Meyer & Anna Prentis Family Foundation, Inc v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 47; 698 NW2d 900 (2005); *Miller v Magline, Inc*, 76 Mich App 284, 313; 256 NW2d 761 (1977).

when the defined benefit plans were underfunded. We initially conclude that the County lacks standing with respect to this particular claim. Standing can exist when a "litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large[.]" *Lansing Schs Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010). This issue is different from the ones pertaining to the threshold rate of return and the discretion to limit excess investment earnings from being allocated to the IEF, which directly affected the amount of assets available for the defined benefit plans. With respect to IEF distributions or disbursements of 13th checks, the assets are already part of the IEF and not subject to being returned for use in the defined benefit plans. For example, in fiscal year 1991, the balance of the IEF at the beginning of the year was $22,678,161; the addition to the IEF at the end of that fiscal year under the formula was $21,747,734, giving a total balance of $44,425,895; and 13th-check disbursements totaled $5,992,439, leaving a balance of $38,433,456. Had the Retirement Commission instead disbursed only $3 million in 13th checks, the ending IEF balance would of course be higher, $41,425,895, but that would have no direct effect on the amount of defined benefit plan assets; the IEF disbursements only affected the IEF balance. The amount of any decrease in total disbursements would not flow back to the defined benefit plans; therefore, a reduction in IEF disbursements would not in turn require lesser contributions by the County. There is no special injury, nor is a substantial interest at stake. The appropriate party for pursuing a claim based on imprudent 13th-check disbursements would be a retiree or survivor beneficiary concerned with the solvency of the IEF program and the availability of future 13th checks.

Moreover, a review of the total annual 13th-check distributions made over the years in conjunction with examination and consideration of the amount of available assets in the IEF in a given year plainly shows that, as a matter of law, the County acted prudently and exercised reasonable care in maintaining the fiscal soundness of the IEF. The Retirement Commission never disbursed unreasonable percentages of existing IEF balances.

### (d) RETIREE ELIGIBILITY FOR 13TH CHECKS

The County next argues that the Retirement Commission breached its fiduciary duties by making 13th-check distributions to ineligible defined contribution plan retirees. Under WCCO, § 141-21(c), which addresses the defined contribution plan, "[t]he retirement commission may pay the pension from the retirement system or purchase an annuity." The focus of the parties' arguments here is on whether a defined contribution plan retiree who has annuitized his or her benefits can properly receive 13th-check distributions, when the IEF program is designed solely for those participating in a defined benefit plan. We decline to address the substance of this issue because the County has no standing to make its argument. Consistent with our standing ruling in regard to total 13th-check distributions in years where the defined benefit plans were underfunded, there is no special injury, nor is a substantial County interest at stake. Assuming 13th-check disbursements should not have been made to certain retirees because they had only participated in the defined contribution plan, it would either have increased the amount of available assets in the IEF or perhaps slightly increased the disbursements to eligible retirees and survivor beneficiaries with no change in

the total disbursements and IEF balance. Any assumed savings would have been enjoyed by the IEF itself or eligible retirees and survivor beneficiaries and would not have been passed on to the defined benefit plans. Absent an effect on the defined benefit plan assets, there would be no correlative effect on the County's contributions. The proper party to pursue a fiduciary duty claim on the basis of 13th-check payments to ineligible retirees would be eligible retirees or survivor beneficiaries whose 13th-check payments were threatened or diluted by the allegedly improper distributions.[38]

### (e) WRITTEN POLICES FOR THE IEF

The County argues that the Retirement Commission breached its fiduciary duties by failing to maintain and implement written policies related to the management of the IEF. The County essentially takes all the other fiduciary-duty claims addressed earlier and contends

---

[38] In relationship to our earlier standing analysis regarding the total amount of 13th-check distributions, claimed by the County to be imprudently high, and in regard to distributions to possibly ineligible defined contribution plan retirees, it is conceivable that less demand on the IEF, assuming imprudent decision-making by the Retirement Commission, would have led to discretionary acts by the Retirement Commission to stem the stream of funds into the IEF, leaving more for the defined benefit plans and less of an ARC. However, this position is so speculative and tenuous that we refuse to apply it to conclude that the County has standing. Additionally, if there had been smaller or fewer IEF disbursements, the IEF balance would have been higher, increasing the amount of the overall investment pool, and with investment gains being allocated chiefly to the defined benefit assets, it could be argued that the County had a sufficient interest in smaller or fewer IEF disbursements. However, given market volatility and downturns, the allocation of some investment earnings to the IEF, and the huge disparity between the amount of IEF assets and defined benefit plan assets, any County interest in smaller or fewer IEF disbursements is insufficient and overly speculative for purposes of standing.

that the Retirement Commission should have had written policies in place in relationship to the subject matter of the claims, e.g., "holding the IEF harmless from investment losses[.]"

Again, MCL 38.1133(3)(f) provides that the investment fiduciary shall "[p]repare and maintain written objectives, policies, and strategies with clearly defined accountability and responsibility for implementing and executing the system's investments." This provision governs *investment* activities, and we question whether the IEF-related arguments posed by the County actually concern investment decision-making. The County, recognizing this in part, claims that there should nonetheless be a fiduciary duty to implement written policies concerning the IEF because it would be generally prudent for an investment fiduciary to do so. We decline the County's invitation to demand more than PERSIA in the context of the particular matters about which the County claims a written policy should exist. A written policy on how to address and allocate investment losses with respect to the IEF seems nonsensical, as the only question is whether such allocation should occur and a reasonable construction of the IEF ordinance would prohibit it. The County is demanding written policies on IEF discretionary matters that do not tend to lend themselves to written policies or that do not require written policies. A more appropriate course would be for the County Board to amend the IEF ordinance to address the concerns raised by the County. On those matters upon which we found a lack of County standing, e.g., complaints about the amount of total annual IEF disbursements, the same standing holding would equally apply in regard to written policies on the matter. On those matters not previously rejected on a standing analysis, we do find a lack of standing with respect to the County's argument that written policies

in relationship to those matters should have been implemented, e.g., a written policy with respect to the threshold rate of return. Because we could only speculate in regard to what the Retirement Commission would have included in a written policy, finding a special injury or substantial interest would be equally speculative. The proper party with standing is a participant or beneficiary to whom fiduciary duties are owed under PERSIA.

The County has failed to convince us that a fiduciary duty exists relative to written policies, that there was any breach of a presumed fiduciary duty, or that the County has standing on the issue.

### (f) ADDITIONAL ISSUES

The County argues that the trial court erred by failing to address its argument that the Retirement Commission violated the first clause of Const 1963, art 9, § 24, by diminishing and impairing accrued financial benefits through the mismanagement of the Retirement System's assets. The County asserts that the failure by the Retirement System to prioritize the funding of the defined benefit plans as opposed to the IEF resulted in fewer defined benefit plan assets, which are designated to pay accrued financial benefits. The alleged mismanagement alluded to by the County consists of the acts or omissions addressed earlier in connection with the breach of fiduciary-duty claims, which now serve as the predicate for the County's assertions under Const 1963, art 9, § 24. We first note that, even though the County raised this issue for purposes of summary disposition, count III of the counterclaim makes no mention of a constitutional violation. Regardless, the constitutional claim fails as a matter of law. With respect to the constitutional claim

based on the fiduciary duty arguments for which we found a lack of standing, the same analysis and conclusion applies. In regard to the remaining arguments underlying the constitutional claim, we hold that there was no actual diminishment or impairment of defined benefit assets when the Retirement System, acting under a construct created by the County Board in the IEF ordinance, merely allowed certain investment earnings to flow into the IEF instead of cutting the flow and permitting those earnings to be stockpiled with existing defined benefit plan assets. If one were to take the County's rationale to its logical end, the whole IEF program itself would be unconstitutional.

Finally, the County argues that the trial court erred by failing to order plaintiffs to pay their attorney fees and costs with IEF assets as opposed to defined benefit plan assets. The County maintains that, win or lose on appeal, the attorney fees and costs incurred by plaintiffs must come from the IEF, as the lawsuit primarily concerned the IEF. The trial court did not directly address this issue, instead simply ruling that no party was entitled to the payment of attorney fees by the opposition. We find the County's argument to be factually and legally undeveloped, and we decline to address the issue. The County provides no legal authority or analysis in support of its cursory single-page argument that the payment of plaintiffs' attorney fees and costs should come from the IEF. As stated by our Supreme Court in *Mudge v Macomb Co*, 458 Mich 87, 105; 580 NW2d 845 (1998):

> "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his

position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow." [Citation omitted.]

IV. CONCLUSION

We hold that plaintiffs established, as a matter of law, violations of PERSIA's exclusive-benefit rule embodied in MCL 38.1133(6), PERSIA's prohibited-transaction rule found in MCL 38.1133(6)(c), and, under MCL 38.1140m, PERSIA's directive giving the Retirement Commission sole authority, through an actuary, to devise and calculate the ARC formula. On the basis of these PERSIA violations, we invalidate and strike down those provisions in the 2010 ordinance, as codified in WCCO, §§ 141-32 and 141-36, regarding the transfer or reallocation of IEF assets, the offset, the amortization caps and ARC formula, the potential reimbursement of the $32 million IEF excess, and the County's control over an offset decision relative to true defined benefit plan surpluses. The net effect of our ruling is that the excess IEF assets amounting to approximately $32 million must be debited from the defined benefit plan assets and allocated or credited back to the IEF in the accounting records, with the County being left responsible to comply with its ARC obligations absent consideration of the $32 million offset. However, we also hold that the remaining provisions in the 2010 ordinance are sound and remain intact, including the IEF funding and disbursement caps, as prospectively limited. Accordingly, with respect to plaintiffs' challenge of the 2010 ordinance and the trial court's ruling, we affirm in part and reverse in part. Finally, we hold that the trial court did not err by summarily dismissing the County's fiduciary-duty claims, nor is there a basis to reverse on peripheral matters raised in the County's cross-appeal

related to Const 1963, art 9, § 24, and payment of attorney fees and costs with IEF assets.

Affirmed in part, reversed in part, and remanded for proceedings and entry of judgment consistent with this opinion. We do not retain jurisdiction. As a public question was involved in this appeal, we decline to award taxable costs pursuant to our discretion under MCR 7.219(A).

O'CONNELL and BECKERING, JJ., concurred with MURPHY, C.J.